## T. and W. BRANDON v. PLANTERS and MERCHANTS' BANK OF HUNTSVILLE.

1. The finder of lost treasure before the loser is known, has a sufficient special property in it to maintain trover against any one who converts it, except the true owner.

2. The possession of a slave who has found lost property, is the possession of his master, and if it be delivered by the slave to any one, not the owner, and the owner is not known, the master of the slave may sue for it.

3. When a defendant demurs to the plaintiff's evidence, the Court may in its discretion, compel the plaintiff to join in the demurrer.

THOMAS and WILLIAM BRANDON as copartners, brought an action of trover in the Circuit Court of Madison county, against the President, Directors and Company of the Planters and Merchants' Bank of Huntsville, and declared for the conversion of certain bank bills, issued by said Bank, two hundred and seven in number, describing them as amounting in all to the sum of $2190, and averring that they were equal in value to that sum. The defendants pleaded the general issue, and the cause was tried at the May term, 1826, of said Court.

At the trial a jury was sworn to try the issue, when the counsel for the defendants below moved the Court

to appoint a clerk to take down in writing the evidence, which was granted. The plaintiffs then, to support the issue on their part, introduced the following proof before the jury, to wit: John P. Brown proved that on the 19th of November, 1824, between 9 and 12 o'clock in the morning, he was standing on the public square in Huntsville, near an engine house, talking with R. Pryor, when his attention was attracted by a negro boy who was cutting wood near there, exclaiming he had found money. He saw the boy raising the bundle The boy stepped towards them and they towards him, and the boy handed the bundle to Pryor, who examined it and handed it to the witness, who also examined it, and they ascertained it to consist of Huntsville bank notes. Witness then asked Pryor what they should do with the notes. He replied that it was the Bank's money, and that they would carry it to the Bank, which was done; and the notes were counted, and by them deposited in said Bank, and a list of the denominations and amounts taken from the Cashier as follows: [here they are described as in the declaration] On the next day he returned to the Bank, and in the presence of Pryor, demanded the notes of the Cashier, who refused to deliver them to him. Wm Acklen, another witness, said he was standing within three feet of the engine house, with his back turned to the negro, and heard the boy exclaim he found the money, and saw the boy hand the bundle containing the notes to Pryor; that a second or two before the boy's exclamation, he had seen the bundle lying near the engine house, but thought it was a bundle of newspapers; that he went with Brown and Pryor to the Bank. Logan Brandon proved that on the same day the notes were found, he went to the Bank in company with Captain Jones, and demanded of the Cashier a description of the notes, which was at first refused, but afterwards granted, and corresponds with the description given by Brown; that the reason of his making said demand was, that the plaintiffs were both absent from home, and in Tennessee; and that he was urged by several persons to go and make said demand. Two other witnesses proved that on the 25th of October, 1825, being near the Bank, they heard Thomas Brandon, one of the plaintiffs, demand of the Cashier in the Bank, and within banking hours, the said notes found by the negro boy, and that the Cashier refused to deliver them,

JANUARY 1826.

T & W. Brandon
v.
Huntsville Bank.

41

and that this was before the writ issued. They also proved that the negro boy was at the time of the finding, and yet remained a slave, the property of the plaintiffs. This was all the evidence in the cause. The evidence taken down was signed by the clerk, who had been appointed, and by the defendants' counsel; the plaintiffs' counsel admitted it to be true, but refused to sign the statement of it. The defendants then demurred to the evidence as insufficient to support the issue, referred the same to the judgement of the Court, and prayed that the jury be discharged from rendering their verdict thereon. The plaintiffs refused to join in demurrer, but being required to do so by the direction of the Court, they then signed the joinder in demurrer. The jury were then discharged, and the Court sustained the demurrer and gave judgement for the defendants.

The plaintiffs now in this Court assign for error: 1st. that they were compelled to join in the demurrer to the evidence; and 2ndly, that the Court sustained the demurrer and gave judgement for the defendants.

M'CLUNG, for the plaintiffs, maintained the following positions:

1st. That any thing found on the surface belongs to the finder of it. [a]

2nd. That any thing acquired by a slave belongs to the master of the slave. [b]

3d. That the possession of the slave is the possession of the master. [c] If a servant, who has a general authority to receive and pay money for his master. gives the money which he may have received from any one for the use of his master, to another person, the master may maintain an action of trover for it against such person, because the possession of the servant is the possession of his master. [d]

4th. That a general or special property will support the action. [e] The finder of a jewel may maintain trover against a stranger who converts it. [f]

5th. That the rule that the lord in England could not maintain an action for goods sold by a villein, is not applicable here, because there is no analogy between villeins and our slaves. Coke Litt. 118. Sec. 177, is referred to on the other side to shew that the master can never resort to his action to recover the acquisition of a slave, but there is a reason for this in England. The condition of

a 1 Blk. Com. 295.
1 Wood. L. 371,
391.    Cooper's
Justinian 461
b Re v.s Dom.
Rel. 343. Coke
L. 11. Salk 68.
6 Mod. 69. Coopers ustinian 20,
109  1 Vesey 488.
c 1 Salk. 68.  6
Mod. 69. Cooper's Justin. 109,
110. 6 Barn. and
Ald. 684.

d 6 Bac. Ab. 684.
Salk. 289.
e 6 Bac. Ab. 677,
685. 1 Bos. & P.
44, 45, 47, 48.
f 1 Strange 505.
7 Term R. 396,
398.

the villein is different from that of the slave ; villeins could
purchase some kinds of inheritances in fee simple, which
the lord could not have. [a] They could sell land, [b] make
a will, and could maintain suits against any one except
their lord ; [c] and they could even sue their lords as ex-
ecutors. [d]

6th. That slavery was unknown to the common law. [e]
The species of slavery existing among us is analagous
to that which existed among the ancient Romans ; among
them, slaves had no civil capacities. [f] The last paragraph
of the preface to Cooper's Justinian, will shew that the
civil law is peculiarly applicable to the condition of our
slaves.

7th. That the Court should here render final judge-
ment for the plaintiffs ; that the measure of damages was
in general, the value of the property and interest on that
value ; [g] that here the amount was ascertained, and was
the value of the notes as shewn on their face. [h]

JANUARY 1828.

T. &W Brandon
v
Huntsville Bank.

a Co. L. 117, a
b Id. 177, note.
c Co. L. 118, b.
Id. 123 b § 189.
d Co. L. 123. b. §
191. 2 Hal. Mid-
ages 198, 199.
e Reeves Dom.
Rel. 339, 343. 2
Blk. Com. 91-5.
f Cooper's Justin-
43. § iv. 411. 4
Dessaussures R.
266. 3 Am. Dig.
481. Laws Ala.
627, 629.

g 3 Am. Dig. 496.
h 1 Cowen. 240.

Hopkins, for the Bank.

No property, either general or special, in the bank
notes found by the slave of the plaintiffs vested in them.
The principle of the common law that grew out of the
relation of lord and villein, and prescribed the terms
upon which the former might acquire a right to any pro-
perty of the latter, applies, and is decisive of the question
between these parties. The similarity between the con-
dition of villeins and that of slaves in this country, and
the little difference between the relation which the former
bore to their lords, and that sustained by slaves to their
masters, authorize the conclusion, that a seizure by the
master of a slave is as necessary to transfer to him any
interest a slave may claim to property, as it was on the
part of a villein's lord to vest in him the rights which
his villein had acquired. The servitude of the English
villein, like that of the American slave, endured for his
life, and descended upon his offspring, with this differ-
ence ; that the slavery of the villein was derived from the
servile condition of his father, and that of the slave ori-
ginates in the servitude of his mother. The villein was
bound to perform services as uncertain in their nature
and degree as the slave is ; the kind and extent of the ser-
vices depended *there*, as it does *here*, upon the will of
the owner. The villein was as much the subject of
transfer from one owner to another as the slave is ; and

of all interest in the acquisitions he had made, he might be deprived by the seizure of his lord; and if, in the property wrested from him, no other person than himself had an interest, his lord acquired by the seizure, the exclusive right to it. But in the seizure, the right of the lord to the acquisitions of his villein commenced; and if before such seizure, they had passed from the possession of the villein, by his own act, by the operation of law, or in any other mode, into that of another person, no claim of the lord could attach to them, similar to that he had to the villein, who owed to his lord, during his life services of any kind. and to any extent that might be required; who might have been sold, in market or elsewhere, to any person who would purchase him, and reclaimed by his lord, if in flight he had sought freedom; no right could be acquired by his lord without seizure. A master of a slave, whose condition resembles so strikingly that of a villein, must support his claim to what may have been casually in the possession of his slave, on the same ground upon which alone a lord could have established his title to any property which belonged to his villein. If a villein had owned a bond, or had been entitled to any right of action against another person, his lord could not have made such a seizure of either as would have enabled him to receive the benefit secured by the bond, or enforce by a suit any cause of action to which the villein was entitled; because he could not have acquired the privity in which the villein stood to the person bound by such causes of action. [a]

a Co. Litt. Title, "Villeing," § 177, and the commentary on it: And Tit., "Descents," § 387, note 1. 1 Tucker's Bla. Com. Part 2, 41, in the note 43.

And who will contend, that if a promise were made to a slave in this country, to pay him a sum of money, or a bond were executed and delivered to him for the same purpose, that his master could maintain a suit for the recovery of the money? His master may, in such cases, as a villein's lord might have done, seize the money when the slave receives it; but he cannot substitute himself for the slave as a party to the contract, or as the person entitled to the action, and recover the sum due on the contract; because the slave in making the contract by which the payment of money was promised to him, or in doing the act by which he would, if a *freeman*, acquire a cause of action, did not act as an agent of his master. If he were determined to be an agent of his master in cases where he acts without his authority, then, if the contract

JANUARY 1828.

T. &W Brandon
v.
Huntsville Bank

he made required the payment of money by him instead of binding others to pay money to him, his master would be bound for the money which he contracted to pay; or if any act of a slave which would, if he were free, make him liable or entitle him to an action, can give a right of action to his master, it must, when it would afford a cause of action against the slave, if he were a freeman, render his master liable.

If the principle be sound when relied upon to support an action for the benefit of a master, it would be so when invoked to sustain an action against him. The application of such a principle would frequently be productive of total ruin to a master; and the consequences of it, when viewed in reference to a master's responsibility for the contracts and acts of his slave, will shew that it is not entitled to a place in the jurisprudence of this country    If a master have a right of action for property which his slave has found, would he not, if his slave destroyed it, or placed it beyond his reach, or that of the owner, be liable to the owner for the slave's destruction of the property? If his claim to the possession of his slave as his own, when he seeks to recover goods which his slave has found, be established, he could not be allowed to disclaim it as his possession when, for the abuse of that possession by his slave, an attempt was made to render him responsible.

But the liability that threatens so much injury to masters, and which the success of the plaintiffs would fix upon them, is avoided by an adherence to the principle of the common law, which confers no right upon them, until they take from their slaves the proceeds of their contracts or the goods which they may have found. If it be money which a master seizes, that had been paid to his slave by a third person on a contract, the seizure of it by the master, cannot render him liable for money which his slave had bound himself to pay. If goods were taken by a master, which his slave had found, the seizure of them could not make him responsible for the conversion of goods by his slave, which were never in his possession. A master upon this principle could be rendered liable to the owner of the goods for his own acts only. Why were not a villein's acquisitions the property of his lord, without a seizure? because pretended acquisitions and claims to property made by a villein, without his lord's know-

JANUARY 1828.

T. &W. Brandon
v.
Huntsville Bank.

ledge, might have subjected the lord to liabilities of greater value than the property of his villein would afford an indemnity against. Hence, a lord's right did not exist until he entered virtually upon the possession; after which event, had he permitted the villein to retain the actual possession, he would have been liable for the abuse of it. A lord was entitled to the security which a view of the extent of his liability, by taking possession of a part at least, and declaring his acceptance of the residue, would afford, before he incurred any responsibility. Security, founded upon the same principle, is necessary to a master against the acts of his slave. If the possession of a slave of which his master was ignorant, be considered the possession of his master, then, for the abuse of that possession by a slave, his master must be liable; and as such possession would in most cases, be concealed from a master, the establishment of the principle relied on to sustain this action, would oftener be productive of injury than benefit to the owners of slaves. [a]

a 6 Bac. Ab, 678, 680.

The plaintiffs have resorted to the code of the Roman or civil law for the support of their action, and have selected from it, and urged a principle which declares that whatever slaves have acquired, whether by delivery, stipulation, donation, bequest, or any other means, is acquired for their masters, although their masters may be ignorant of, or averse to the acquisition. [b] The code in which this principle is contained, subjected masters to many liabilities for the acts of their slaves, done without their knowledge, from which the common law exempts them. If a Roman slave had borrowed money, and without the knowledge of his master, paid with it a debt of his master, or had purchased with it for him, and without his consent, an estate or any other thing which his master did not want, the master became liable to the lender for so much of the money as the slave had expended on his account. [c] The common law would exempt a master from such liability, on the ground that the payment of the money in discharge of his debt, or the purchase for him of an estate, was not made upon his request. Slaves were entitled by the civil law, to their *peculium;* which consisted in what they saved from a monthly and daily allowance granted to them for their sustenance, or procured by any other means, with their master's consent. This *peculium*, with their master's permission, they laid

b Cooper's Justin. 109.

c Cooper's Justin. 350. § 4.

out at interest, or purchased with it a slave for them- JANUARY 1829.
selves, or traded with it in any other way; but their
masters were liable to the extent of the value of their T. & W Brandon<br>v.<br>Huntsville Bank.
*peculium*, for their contracts, and the injuries done by
them. [a] If a slave who had no *peculium*, committed a a Cooper's Justin. 331. § 10.
theft or robbery, or did any damage, his master was lia-
ble for it, and was obliged either to pay the estimate of
the damage done, or deliver up his slave as a recom-
pense; and when a master chose in such cases the alter-
native of delivering up his slave, he was still bound for
the injury which had been done, to the extent of the
*peculium*, if his slave owned one. [b] These liabilities of b Cooper's Justin, 354. § 1.
masters furnish the reason of the principle which secured
to them all the acquisitions of their slaves the moment
they were made. The right of masters to such acquisi-
tions was necessary to indemnify them against their re-
sponsibility for the acts of their slaves. If a slave had
destroyed or converted by consuming in the use of it,
property which he had found, the civil law held his mas-
ter liable to the owner of the property for such injury
done by his slave, to the extent at least, of the value of
the slave, and that of his *peculium*. [c] But he who loses c Cooper's Justin, 354, § 1.
property in this country can claim no responsibility of a
master, whose slave may find and destroy, or consume it,
in using it.

As such acts of slaves in this country create no lia-
bility against their owners, there is no reason for sus-
taining a claim of a master, founded upon an act of his
slave which he did not direct, and of which he did not
know when it was done. If this question is to be decided
by analogies, drawn either from the common or the civil
law, those afforded by the source of nearly all our legal
principles ought to determine it. But if, from the inca-
pacity of our slaves to acquire property, in which they
differ from both the English villeins and Roman slaves,
it be inferred that a rule of decision can be found in nei-
ther of the codes, upon what ground can this action be
maintained? As our slaves are incapable of acquiring
property, they cannot be regarded by our law, as persons
who can acquire the rights and incur the liabilities which
free persons do by finding any thing; and the free person
who first receives from a slave any subject of property
which has been lost, becomes entitled to the rights pro-
vided for those who may find any thing.

JANUARY 1828.

T. & W. Brandon
v.
Huntsville Bank.

A villein had rights against all mankind except his lord; and the right of a lord to take what belonged to his villein, was founded upon the villein's want of rights against him. A villien's destitution of rights as to his lord, was as total as a slave's is as to his master. A lord by his seizure, converted into his own property, what belonged to his villein, and his villein had no right to resist the seizure. A slave in this country, has no civil rights against any person; he has no capacity to acquire; he can own no property. As he has no civil rights against any person, any person may, as a villein's lord only could have done, seize what a slave has found and has in his possession. If a master were to take from his slave what the slave had found; the right of the master to the property would be founded, not upon a seizure of what belonged to his slave, but upon his own taking of what was in the legal possession of no person. In such a case, the master would be legally the finder of the property. [a] A person who finds goods, acquires in them a special property only; [b] and if the slave could acquire a special property in goods which he found, and his master were entitled to that special property without seizing the goods, the plaintiff could not maintain this action without having united to the special property the actual possession of the bank notes. They cannot rely upon the possession of them by their slave as their possession by an agent, without a recognition of a principle which would make masters liable to the owners of property found and converted by their slaves. If a person entitled to a special property in chattels give them to another, and a third person convert them to his own use before the donee receives the possession of them, the donee can maintain no action for the conversion. [b]

If, therefore, a slave can acquire a special property in goods which he may find, and that property can be transferred by the operation of the laws of the country to his master, a transfer in this mode, of the special property, could not more effectually vest it in his master than a gift by one of his special property would in the donee, on the ground that the special property in the notes, acquired by finding them, was transferred by operation of law, to the plaintiffs; yet, as the conversion was made by the Bank before the plaintiffs received the possession of the notes, they can no more maintain an action than could

a 2 Chalmers opinions of eminent lawyers 263

b 6 Bac. Ab. 683-5-6.

c 6 Bac. Ab. 683.

-a donee of special property who never had possession. Neither the master nor the donee could support *trover* by calling to his aid the possession of the person under whom he claims, because he would not be liable for any abuse of that possession, and can therefore derive no benefit from it. " The right of a sheriff, carrier, or a person who finds goods, to maintain *trover*, is founded not only upon their special property and possession of the goods, but in the two former cases, on the liability of the sheriff and carrier to their principals; and in the latter, on the responsibility of the finder to the rightful owner of the goods. *b* The plaintiffs never had the possession of the notes which their slave found, or knew of the slave's possession of them during its continuance. The possession of the slave, on which they rely for the support of their action, created no responsibility against either the slave or the plaintiffs, in favor of the owner of the notes, and can therefore afford no part of the ground of this action.

KELLY, for the plaintiffs in error, in conclusion.

I concede the doctrine read from the English books on the subject of demurrers to evidence, and that there a plaintiff may in a proper case, be compelled to join; but the Courts there set aside verdicts *toties quoties* until they accord with the views of the Court. Here, the power of the Court is restrained : no more than two new trials can be granted. Could the Court on a third jury trial, draw to itself the determination of the issue? or would not the plaintiff be entitled to the decision of the jury, and to judgement if their verdict was for him, which in such case would be beyond the control of the Court? The English Courts could order a nonsuit; but our Courts have never done so. Here, a plaintiff can insist on a verdict if he choose, and the power of the Court over the verdict has heretofore, by our practice, been the only remedy. There can be no difference in principle between ordering a nonsuit and sustaining a demurrer to evidence; in both cases the Court decides on the sufficiency of the evidence. The same reason then that gives the right to a party to risk his case before a jury, even without proof, would restrain the Court from compelling him to join in demurrer to the evidence, else he cannot have the full benefit of the statute which prevents the granting of more than two new trials.

*Margin notes: JANUARY 1828. T. & W. Brandon v. Huntsville Bank. a 2 Term R. 750, 1 Came's R. 14. b 12 John. R. 403, 407; Hotchkiss vs. McVickar. 1 Chitt. Pl. 151.*

42

JANUARY 1828.

T & W. Brandon
v.
Huntsville Bank.

If the argument of the defendants' counsel was correct, it would sustain our objection to join in the demurrer; for if the evidence be of such doubtful character as is intimated, it would clearly be of that inconclusive kind as has always by the Courts been submitted to juries. It is insisted the evidence does not shew affirmatively that the Cashier knew the money was found by the negro, but that it puts the money in the attitude of a deposite in Bank by Brown and Pryor. It is true, it is not stated in so many words that the Cashier was told of the finding, but his ignorance of it cannot be inferred, for that fact is no more stated than his knowledge. The Court must take as true all the facts proved, and also all those which the evidence tended to prove; and will draw all such conclusions and inferences from them as a jury might legally do. Then it is not so inconclusive as is supposed, for all the circumstances shew he must have had this knowledge. A list and description of the bills was taken for the benefit of any one concerned; Brown and Pryor pretended no claim to the money, and the Bank did not receive or treat it as a deposite from them, for on their demand the next day, the Cashier refused to restore it to them. From those and other circumstances, it is impossible that a jury should have doubted a moment, that the Cashier knew of the finding by the negro; the inference is irresistible. The singularity and novelty of the occurrence, and the publicity of the place, renders it impossible that the fact was not communicated by Brown and Pryor, or some of the crowd. But it is not necessary to establish the inference against them, for the Bank's ignorance could give them no title whatever to the money. The defendants stand as *tort feasors*, criticizing the plaintiffs' right when they shew none themselves, and they are to be treated as such.

It is said corporations have no souls, and consequently are incapable of social feelings; yet the greatest anxiety is manifested to protect the plaintiffs from the responsibilities that would, as it is said, follow the rule we contend for. It would seem indeed, that the effort on their part is rather to protect the Brandons from loss, than to retain themselves money they have no title to; for it is said as a reason to do so, that the plaintiffs cannot claim the money without having had possession, unless they necessarily become liable for the misuse of it by the

slave, even without their knowledge; ánd against this they strongly protest. That consequence however, may not, and it will not necessarily follow, but if it did, it would avail the Bank nothing; for it would only furnish an additional reason why the funds should be restored to the plaintiffs, to enable them to meet such future responsibility.

It is inferred on the other side, that no right accrued to the master to property found by the slave, because no decisions are to be found in this country establishing such right. I must confess that I was astonished to find the books so barren on the subject. Slavery has existed from the first settlement of the colonies, and occurrences of this kind must have happened; yet no question seems to have arisen in the American Courts as to what title the master acquired in property so found. But I account for it differently from the defendants' counsel; the right of the master to all the slave possesses, seems to me so palpable and plain, that I presume it never was contested.

The principle on which we rely, is prominent in all systems, and was at all times. The harmony of society requires that there should be a known owner for all property; who it shall, be is comparatively of little importance. Occupancy was the beginning of property, and if lost or abandoned, any one might appropriate it, but none could disturb the possession of another. On this simple elementary notion of property, the various systems of civilized society have arisen   In all countries and ages, the finder of property acquired a right of some kind to it, subject to the claim of the owner, and in some countries to other legal restrictions. Treasure trove in England is a part of the king's prerogative, or at least of his revenue. The finder was required to divide with the king *pro bono publico.* Here, no fiscal regulation of that kind existing, the finder is on so much better ground. A right in the finder to some extent is recognized in all systems, and this is enough for us to prevail over a wrong doer. If then the money had been found by a free person, there could be no difficulty, as his title would be better than that of him who had none.

The question here is, what disposition will the law make of property found by a slave, the true owner being unknown? Shall the title vest in the master *ipso facto,* or shall the found property be open to the pillage of any dis-

JANUARY 1828.

T. & W. Brandon
       v.
Huntsville Bank.

orderly person? Policy forbids the existence of property without an owner, and the sole reason of preventing lawless depredations on the helpless slave, would be sufficient to invest the master with title. Frigid casuistry may degrade the slave to the condition of a domestic animal, and see nothing rational or intelligent in him, but the generous master who is fit to wear the name, can appreciate and reward his virtues and fidelity. The law on one hand gives to the master, the slave and all his acquisitions of every kind; and on the other, creates the high obligation on his part, to protect him against the violence and injustice of all persons, natural or artificial. Who then is so proper as the master to be substituted by the law in the place of the owner, when property is found by a slave?

I will not follow the defendants' counsel through the mazes of feudal times, in search of analogies between the feudal vassal and the American slave. The principles of the feudal system have never been transferred to the other departments of the law; they belonged to that peculiar system of military government, and are unfit for any thing else. The system has mouldered away; it and its principles have long since been cast off as trumpery no longer applicable to the concerns of man, and other more rational systems have been built on its ruins. Why then explain from early writers that the feudal lord might seize the property of his vassal, and that if he failed to do so and the vassal sold it, he could not disturb the alienee?

From the origin of that system, and through all its stages of barbarism, some legal rights were recognized in the vassal, and therefore it was necessary those rights should be defined and regulated. It was enough to allow the lord to plunder his vassal personally, but there was no necessity to carry that right to his alienee; there was no want of an owner. The lord, the vassal or the alienee, might own as between themselves, and their rights were adjusted by the principles of the system; one of which was, that the lord must seize the property while in the vassal's hands, or he could not pursue it in the hands of another. As the vassal himself might own, and no title vested in the lord till seizure, it was a condition precedent to his right. As slaves here have no right at all, the principle of seizure does not apply.

JANUARY 1828.

T. & W  Brandon
v.
Huntsville Bank.

The counsel for the Bank dwells much on consequences; let us take a glance at the consequences of the principle of seizure between master and slave here.   To pursue the analogy, he cannot stop at found property.   The feudal lord was not confined to it; all the gains of the vassal of every kind, were subject to seizure by him in the presence of the neighbors; it must therefore be extended to every thing.   Many negroes are allowed to own pigs, poultry and other small articles, some, even cows and articles of larger value.   The aggregate value of the negro property in the State, which the master has never seized or even known of, is considerable.   Under the principle contended for, any one might go round and gather it all; and when complaint was made, although he would distinctly admit on the record that he had no title at all, yet he would gravely tell the master that he had not pursued the formalities of the feudal system, which perhaps he never heard of, and that as he had not seized the property, it must remain where it was.   This field for pillage would necessarily be opened by the adoption of the principle insisted on by the Bank.   The counsel for the Bank, with his usual ingenuity, has endeavored to divert the attention of the Court from its true point, by drawing us into an investigation of the master's liabilities for the acts of his slave, when that is not the subject of controversy. Now I protest against considering this question till the case occurs; then it will be proper to examine to what his liability for the misconduct of his slave extends, and not till then; it is now only obscuring and embarrassing the question before us.

The question being as to what property the master acquires in goods found by his slave, we cited passages in Justinian, to shew that by the laws of Rome, the master was entitled to the acquisitions of the slave, and that the possession of the slave was the possession of the owner; and we have endeavored to shew the reasonableness of those features of the Roman law, and their application to this case.   The gentleman has drawn from the same book a train of consequences to hang round the principle we contend for, and to frighten us from its adoption; supposing that we must necessarily adopt, if any, all their laws relating to slavery.   He argues that the *noxal* action of the Roman law, against the master, for the thefts and trespasses of his slave, cannot prevail here; and there-

fore, that the master cannot be allowed the acquisitions of his slave. But this consequence does not follow, for this action is not a consequence of the principle we have extracted, and cannot follow it, unless the reasoning on which it rested in Rome would sustain it here. The *condictio de peculio* is one action given in Rome against a master, not because the master had a right to the property acquired by his slave, but because t'e slave himself had property called his *peculium*, originating in the savings he made from his allowances. On that property, by the consent of his master, he could trade, and if he did so, the master was bound to see his *peculium* fairly applied to the payment of the debt contracted by the slave on the faith of it. The master was not liable unless the creditor could shew that the slave had property, that is, *peculium* to meet the demand. The *condictio tributarii* was another action founded also on the property of the slave, in which the master was allowed to retain a rateable proportion of any debt due by the slave to him. Both these actions were clearly founded on the property of the slave, and not on any right of the master, and are analogous to suits against an administrator, founded on the intestate's property. If ever the policy of our law shall allow the *peculium*, and the right to deal on it, then, and not till then, need we inquire if such action against the master shall come with it.

The book does not distinctly indicate the principle or ground on which the *noxal* action was founded. It was given by the law of the twelve tables, and by subsequent prætorian edicts, and was not founded on the Roman common law, if I may be allowed the expression. It can however, be easily traced to a very different principle from the right of the master to all the acquisitions of his slave, except his *peculium*, this right being the plain result of ownership, and the fair equivalent for the purchase money. But liability for crime must refer itself to the penal code. How far the master should be held responsible, depends on his means of preventing the crime. In Rome the master had the most absolute power over the person of his slave, even over his life. Such absolute control there, might well draw after it responsibilities, which here should diminish rateably with the power of the master, and as the master has no such power here, the *noxal* action of Rome does not apply. But we must

test the responsibility of masters here by the principles of our own mitigated system of slavery. The question of the master's responsibility for the misconduct of his slave has not yet arisen, and in this case can never arise, as there was no misconduct in the slave; so we need not inquire about it.

Many cases are cited to prove, that a person having only a special property, and who had no actual possession, connot maintain trover. But in all those cases the general owner was known; and in none of them is it settled how the law will dispose of property found, where the loser is unknown. How far the special owner will be protected where the true one is known, is one thing; and whether the law will suffer property to remain without any owner, general or special, is another; for in the first case, although the special owner cannot sue, the general owner can, and the wrong doer can be brought to justice; and in the second, the property is open to pillage and plunder. This case calls upon the Court to raise an ownership by implication, to preserve the symmetry of the law and harmony of society.

It is said that Brown and Pryor are to be considered as the true finders, and that the negro cannot; that there is no difference between the taking up of a bundle by a negro, and a taking up by any domestic animal; and that the first person who receives it from either is to be considered in law the legal finder. It is apparent that Brown and Pryor never claimed the money nor considered themselves as the finders. In feudal times, none but the lord had the right to seize the property of the vassal. The difference or analogy between a negro and a domestic animal, is not a fit subject of grave inquiry; a passing remark, however, may not be amiss. A dog is to some purposes, considered as property; he has sagacity to some extent, and remarkable fidelity, and is physically capable of taking up such a bundle, and carrying it home or elsewhere; and if the animal had taken up lost treasure and evinced a clear and manifest disposition to carry it home, it would be very difficult to prove that a good title could be acquired by any interloper who would take it from him on the way. The law had better even in that case, if the real owner was unknown, vest the title in the master than in the one who could only say, I took the money from my neighbor's dog; a poor title indeed. But we need not speculate on this subject. The debate is con-

cerning a higher order of creation, a human being endow⸙ ed with reason, able to appreciate the value of property, and to exert the care necessary to preserve it for the benefit of his master. Such a being should not be degraded below his proper station in order to form the basis of a decision not otherwise sustainable.

The title of the finder is subordinate to that of the real owner, and the rule we contend for would benefit the real owner. It is better for him that the law should adjudge the found property to the master, as he will more likely be able and willing to account for it than any worthless person who might and probably would obtain and waste it, if permitted by law. ·

The remark of Chief Justice Marshall, read from Wheaton, that negroes were considered as merchandize, in our international stipulations with England, although very true and proper in its place, sheds no light upon this controversy. The decision in Johnson is of the same character; it does not touch the point in dispute here. The sheriff failed to recover there because he had not levied, and had never been in possession of the property. If his deputy had levied and been in possession, that possession would have been his, by all the authorities on the subject; who acts by another, acts by himself, and so we insist the slave's possession is legally that of the master.

It is true, the books speaking of actions by bailees and other special owners against wrong doers, frequently say the action is allowed because they are liable over to the owner. That reason is good where it applies, and may be the principal reason where the owner is known, or where the nature of the claim implies an ownership that is or may be known. The title to found property is apparently different from the special property of bailees, factors, &c. It is rather a conditional general ownership, that may be terminated on the appearance of the former owner, than a special ownership that must from its own intrinsic character, be terminated. The owner may never appear to assert his better claim. The finder is as to all the world except the loser, the general owner for all purposes of the law, and should be considered as standing in his shoes; his right is complete till defeated, which may never happen.

Under the influence of these principles, we insist the judgement should be reversed and here rendered for the

amount of the notes and interest from the demand to the time of the judgement below. There is no need of a jury. By demurring to the evidence, the Bank has agreed to the amount if liable at all. Where the rule is certain by which the damages are to be measured, the Court can give judgement in numero, especially where the cause has been taken from the jury by a demurrer to evidence, and submitted to the decision of the Court.

The novelty of the question, the want of precedents, and above all, the excursive range into the affairs of other times and countries, taken on the other side to prove that the Bank should remain quietly in possession of money to which it has no title, must plead my excuse for the pro‑lixity into which I have been drawn in this argument.

*By* JUDGE SAFFOLD.

This was an action of trover to recover $2,190 in notes of the Huntsville Bank. The parties proceeded to trial on the general issue. The trial was wrested from the jury by a demurrer to evidence on the part of the defandants; which demurrer the Circuit Court sustained, the plaintiffs having refused to join in it until required by the Court to do so,

It is assigned for error, 1st. That the Court compelled the plaintiffs to join in the demurrer to evidence. 2nd. That the Court sustained the demurrer, and gave judgement for the defendants.

Evidence was introduced only on the part of the plaintiffs, and which, though of the grade of parol, was not of a circumstantial, but positive nature. Under such circumstances, I am of opinion that according to well established principles of common law practice, the defendants had a right to demur to the evidence. Had the evidence been of an uncertain or indeterminate nature, leaving the facts to be inferred from circumstances, the propriety of compelling the party to join in demurrer would have been more questionable. But the authority to demur to evidence, is founded on the supposition, that no injury can result to the adverse party; that the consequence of withdrawing the issue of facts from the jury, and referring the entire case to the Court, is an admission by the party demurring, of all facts which the evidence offered conduces to prove, or which the jury could be authorized to infer from it.[a]

43

*Margin notes:* JANUARY 1828. T. &W. Brandon, *v.* Huntsville Bank. / [a] 2 Esp. N. P. 584–5.

But it is contended, that the statute which denies to either party the benefit of more than two new trials in any case, should have the effect to vary the common law practice in this respect. The practice of demurring to evidence in proper cases, often tends to promote con‑venience and dispatch in the administration of justice, and to preserve more distinctly the boundaries of right from prejudice, or the influence of extraneous circum‑stances. For should we presume the Courts are no less liable to prepossessions than juries, yet the decisions of the Courts are subject to revision in the appellate juris‑dictions, which cannot be had on jury determinations. Before so material a right should be abolished, I think we should require express legislation to that effect, and that it cannot be done by implication from the statute alluded to. That statute can only have the effect to pre‑clude decisions by the Court, in cases of conflicting or doubtful, and indeterminate evidence. In such cases, where the chief difficulty rests on the ascertainment of facts, there is great propriety in leaving the determina‑tion as the law has done, with the jury, under the instruc‑tion of the Court as to the law.

On the second point respecting the decision of the Court on the demurrer, the substance of the evidence is found to be, that a negro boy, the property of the plain‑tiffs, found the money, consisting of notes on the Hunts‑ville Bank, to the amount mentioned, shewed the same to persons near him at the time, one of whom received the money, carried the same and deposited it in the said Bank as money found in the way mentioned, and took from the Cashier a list of the amounts and denomina‑tions of the notes; that on the next day the same person demanded the money of the Cashier, who refused to de‑liver it to him; that at the time the money was found and placed in Bank, both the plaintiffs were absent from the State; and further, that after the return of one of the plaintiffs to the State, and before the institution of the suit, he demanded said money of the Cashier during banking hours, as having been found by said negro boy, which the Cashier refused to deliver to him. These facts were positively stated by several witnesses, without any conflicting testimony. Upon which, the question arises, whether the owner of a slave, who has found mo‑ney, is entitled by law to sue for and recover the same,

·in the absence of any evidence respecting the loser or
proper owner, without having reduced it to actual pos-
session, and after it has passed into the possession of
another person as lost treasure.

This is believed to be a novel question in the United
States, and one involving some intrinsic difficulty; and
that the condition of slaves in the United States has no
exact parallel in the history of any other country of.
which we have reports of the judicial decisions.  Nor
have the researches of the eminent counsel who have
been engaged in the investigation of the case, or the sub-
sequent examination of the Court, discovered any Ameri-
can adjudication directly in point.   We are, therefore,
left to decide according to the general analogies of the
law, and the peculiar policy of this government.

If the principles of the civil law. can be regarded as a
safe rule for our conduct, they appear quite decisive of
this controversy.   In Cooper's Justinian *a* it is said, *a* Page 102,
whatever your slave has at any time acquired, whether
by delivery, donation, stipulation, bequest or any other
means, is acquired by you, although you may be igno-
rant of it, or were adverse to the acquisition ; for he who
is a slave can have no property.   And if a slave be made
heir, he cannot otherwise take upon himself the inheri-
tance than at the command of his master; but if com-
manded so to do, the inheritance is as fully acquired by
the master, as if he had himself been made heir; and
consequently a legacy left to a slave is acquired by the
master.

It is contended on the part of the defendants, that the
condition of slaves in the United States may be assi-
milated to the feudal villeinage of England, and it is
shewn from 1 Coke on Littleton, *b* "that if a villein pur- *b* Lib. 2. § 177.
chase land and alien the same to another before the lord
enter, then the lord cannot enter ; for it shall be adjudged
his folly that he did not enter when the land was in the
hands of the villein ; and so it is of goods.  If the vil-
lein buy goods and sell, or give them to another, before
the lord seizeth them, then the lord may not seize them."

Hence it is insisted that though the master here may
entitle himself to money or goods found by his slave,
provided he seize them while in the hands of the latter,
yet if they in any way pass out of the hands of the slave
before the master reduce them to actual possession, he
can never afterwards assert his claim.

For the plaintiffs it is urged, that American slaves may be better assimilated to those of the Greeks and Romans. In 4 Dessaussures' Reports, " it is said, " the condition of slaves in this country is analogous to that of the slaves of the ancient Greeks and Romans, and not that of the villeins of feudal times; they are generally speaking, not considered as persons, but as things; they can be sold or transferred as goods or personal estate; they are held to be *pro nullis pro mortuis.* Almost all our statute regulations follow the principles of the civil law in relation to slaves, except in a few cases, wherein the manners of modern times, softened by the benign principles of christianity, could not tolerate the severity of the Roman regulations." In the same case, it is decided, that slaves cannot take property by descent or purchase; that a legacy to a slave, failing from incapacity to take, sinks into the residuum of the estate, and is subject to the payment of debts. That slaves in the United States are incapable of contracting for, or in any way acquiring property in their own right, is the inevitable consequence of their degraded condition; which denies them the privilege of deposing against white persons, or of suing or being sued, either in law or equity. In the South Carolina decision alluded to, no opinion is intimated respecting title to property, which, by the proprietor, may be abandoned to a slave, or found by him; and to which there is no other claim except that of the master, and the one who may have first received it from the slave.

With other distinctions which exist between slavery in the United States and that of the Romans, it is shewn that with respect to the latter, the slave could own in his own right his *peculium,* and was responsible for his torts to the value thereof, or the injured party could seek his redress against the master and recover the damages sustained, or have the slave delivered up as an indemnity as far as his value would go. To the extent of the slave's *peculium,* which is understood to be his individual savings from his daily earnings, he was permitted to trade and acquire property in his own right. Therefore, having some capacity to trade, it followed as a consequence that any thing which he acquired and disposed of before the master reduced it to his possession, was placed beyond his reach. In this country it is so far different, that to create responsibility on the master, the slave must

at the time be in his immediate employment, or from his vicious habits and general liberty, some degree of culpability must attach to the master to make him responsible. With respect to commerce, our slaves can do nothing in their own right, can hold no property, can neither buy, sell, barter or dispose of any thing without express permission from the master or overseer; so that every thing they can possess or do, is in legal contemplation, on the authority of the master. But does it result that every thing they are found in possession of, is to be regarded as unappropriated and abandoned to the first occupant, unless it is necessarily so? Policy would seem to forbid it. None ever denied but that slaves are rational intellectual beings; they have capacity to know that value attaches to property, and how to take care of it. Many things are necessary to their own comfort and support, which the owner is bound to furnish, and the owner is absolutely entitled to all their earnings. If, in order to avoid contention and strife respecting treasure found by or abandoned to a slave, it is the policy of the law to designate some proprietor, there would appear to be great propriety in making the owner that person. It is also necessary on the principles of humanity to slaves, that they should be protected from the depredations and violence of persons who might discover them in the possession of articles which the master had not actually seized; and there can be no distinction in principle whether the article be of great or little value, or whether lost, abandoned or given by the proprietor.

An argument from the defendants' counsel which appeared to give some plausibility to the defence, was, that to authorize a recovery in trover, the plaintiffs must have a general property in the article, or have had actual possession of the special property; and that if in cases like the present, it is held that the possession of the slave was the possession of the master, the rule would subject owners to dangerous responsibility for abuse or misuse of property, of which they had no knowledge or control. I admit if this would be a consequence of the doctrine, it would be fatal to it; but I think it cannot be considered that masters are in all cases responsible for the torts and crimes of their slaves, committed on special property while in their possession. In such case, if the master has bestowed all the care and diligence on the bailed property, that

the law exacts of a bailee; and if his slave or any other person, in relation to which he is in no way censurable, commit a depredation on it, he is not responsible. If one as bailee has placed the property in a situation promising every reasonable security, and his slave or any other, by art or violence, which could not have been anticipated or resisted, take or destroy it, the bailee is not responsible. With respect to special property, the liability of the possessor depends much on the nature and terms of the contract, whether express or implied; and as respects lost goods, if little or no security is offered the loser while they remain with a slave as the finder, it must be viewed as his own fault or misfortune, that the property is not in responsible hands, and as respects the owner of the goods, his security is in no respect weakened by the rule that the master shall be preferred to all other claimants except himself.

But I think found property is to be viewed in a light something different from absolute general property, or special property in the usual acceptation of the term. I am of opinion that the finder, and if a slave, the master, is the apparent general owner of the property under an uncertain or contingent title; one that may be defeated by the discovery of the owner or loser, if he has not abandoned the same; and that this is the true and safe rule, warranted by the analogies of our law, and directed by the same necessity that confers title by occupancy to property to which there is no owner. Special property in the general acceptation, and as referred to in the cases cited, presupposes an absolute title in some person known to the possessor, or who will doubtless be known. With respect to found treasure when the loser is unknown, it is doubtful whether the finder's title can ever be defeated. He cannot honestly conceal the finding, but he is the ostensible and legal owner of the articles, and may publicly retain them, except as to such things as the statutes have otherwise provided for, until the loser is discovered; which may never happen.

My opinion is, that the judgement below must be reversed, and that judgement be here rendered in favor of the plaintiffs for the amount of the bank notes sued for, with interest thereon from the date of the demand, which was the issuance of the writ, and in this a majority concur.

## By JUDGE CRENSHAW.

Two positions have been taken in the argument of the case, one of which seems preliminary to the main question, and which was, whether the Court could compel a party to join in a demurrer to evidence? The rule, as I am able to collect from the law, appears to be that the Court may compel a party to join in a demurrer to evidence or to abandon his evidence; and that this is a matter altogether within the discretion of the Court.

The main question now is, whether the evidence authorized the judgement of the Court. The facts arising from the evidence appears to be, that the plaintiffs' slave found the bank bills in question; that they were taken to the Bank by another person, who received them from the slave and delivered them to the officer of the Bank. As applicable to this case, I hold the law to be, that the finder of a chattel acquires at least a special property in the same, and his right is good against all the world, except the lawful owner; that the possession which he acquires by finding is sufficient to enable him to maintain the action of trover against any person who may convert the property except the true owner, and that possession itself is presumptive evidence of right.

I further maintain that, in this country, a slave is in absolute bondage; that he has no civil right and can hold no property except at the will and pleasure of his master; that his master is his guardian and protector, and that all his rights, acquisitions, and services are in the hands of his master; that a slave is not a beast, but is a rational human being, endowed with volition and understanding like the rest of mankind, and that whatever he lawfully acquires and gains possession of, by finding or otherwise, is the acquirement and possession of the master. That the negro gave up voluntarily to Pryor and Brown the bank bills which he had found, could not deprive the master of his right to them, which had previously vested by the finding of the slave; nor can the circumstance of Brown and Pryor depositing them in the Bank alter the nature of the case; because the evidence does not warrant the inference that they were credited with the amount, or that the officer of the Bank who received them, was ignorant who had found the money. The rule is to infer strongly against the party who demurs, but to infer nothing against his adversary, unless the inference be irresistible;

because by his act he has drawn the subject from the jury, who are the proper triors of facts, and inferred it to the Court who is the peculiar organ of the law.

But in argument it was objected that the action was given to the first finder of a chattel, because he is ultimately liable to the rightful owner for its value, whenever he might appear to claim it; and that if it were taken from the slave before it came to the knowledge or possession of the master, in that event he cannot be liable to the rightful owner; and for this reason, the master shall not have the action to recover the value of the chattel. In answer to this objection, it is contended that the finder's liability to the rightful owner for the value of the chattel, is one reason why the law gives him the action; but another, and perhaps a better reason is, because the finder, by the mere act of finding and taking possession, acquires a right of property against all the world, except the lawful owner, or one who shews a better right. In disposing of the case before us, it is not necessary to meet this objection; if the law give the plaintiffs a right to the present action, it cannot be material to inquire after consequences which may possibly arise. When the question of the plaintiffs' liability to the rightful owner arises, we will endeavor to meet and decide it on principles of law. Argument drawn from villeinage under the feudal system, and slavery in ancient Rome, have been resorted to in order to prove by analogy, that the possession of a slave who finds a chattel, is not the possession of, and vests no right in the master, unless he seize it while in the possession of the slave. The feudal system was peculiar to itself, but under all its rigor the villein or vassal had some civil rights; but whether he had civil rights or not, the rules of that system as law, can have no application in relation to the condition of slavery among us, nor can the condition of slavery in ancient Rome, however abject, aid us in illustrating the case before us.

The defendants can be viewed in no other light than *tort feasors* or trespassers, who have got possession of what is not their own; for there is not a particle of testimony tending to establish a right of property in the Bank, either qualified or general.

I am of opinion that the judgement should be reversed, and the proper judgement rendered by this Court for the

-nominal amount of the bank notes, by way of damages. I say reversed and rendered, because the bank bills are presumed to be worth their nominal amount, in the absence of testimony to the contrary. Judgement reversed and rendered.

JUDGES TAYLOR and WHITE, not sitting.