(64 South. 881.)

No. 19,883.

J. A. BEL LUMBER CO., Limited, v. STOUT.

(March 2, 1914. Rehearing Denied April 13, 1914.)

(Syllabus by the Court.)

1. LIMITATION OF ACTIONS (§ 30*)—PRESCRIPTION—ACTION FOR DAMAGES—CONVERSION OF LOGS.

Where, in a suit for the recovery of logs (known as "sinkers"), alleged to have been acquired by defendant in bad faith and in disregard of the alleged rights of plaintiff, or, in the alternative, for damages, based upon the alleged value of the logs when converted into lumber, it appears that plaintiff knew, before the institution of the suit, that the logs had already been converted into lumber, it will be held that the suit is one sounding in damages, as for a quasi offense, and, as such, barred by the prescription of one year, in so far as the same is applicable to the facts.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 141; Dec. Dig. § 30.*]

2. LOGS AND LOGGING (§ 35*)—ACTION FOR CONVERSION—BURDEN OF PROOF.

In an action for the recovery of logs (known as "sinkers"), or, in the alternative, for damages, for alleged tortious acquisition and conversion, the burden rests upon plaintiff to prove title, and identify therewith the logs described in his petition as having been so acquired and converted.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 113–115; Dec. Dig. § 35.*]

3. LOGS AND LOGGING (§ 35*)—CONVERSION—RIGHT OF ACTION.

Where, in a community in which there is a common understanding to the effect that sunken logs are to be considered derelict and abandoned and become the property of him who raises them, a millowner buys such logs from those who have raised them, or himself engages in raising them for his own account, without regard, in either case, to the brands or marks that they may bear, other persons similarly situated may presume that he acquiesces in such understanding in so far as it may affect logs bearing his brands or marks, and cannot be mulcted in damages for buying such logs in the open market.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 113–115; Dec. Dig. § 35.*]

Breaux, C. J., dissenting.

(Additional Syllabus by Editorial Staff.)

4. ABANDONMENT (§ 2*)—ELEMENTS.

Abandonment of property, like abandonment and acquisition of domicile, is made up of two elements—intention and action or inaction. The intention to abandon may be inferred where the owner makes no effort and takes no action looking to the recovery of his property, particularly where he acts upon and profits by a common understanding that such property, under such circumstances, is to be deemed abandoned.

[Ed. Note.—For other cases, see Abandonment, Cent. Dig. § 1; Dec. Dig. § 2.*]

Appeal from Fifteenth Judicial District Court, Parish of Calcasieu; Winston Overton, Judge.

Action by the J. A. Bel Lumber Company, Limited, against J. C. Stout. From judgment for defendant, plaintiff appeals. Amended and affirmed.

Robert R. Stone, of Lake Charles, D. R. Rosenthal, of Shreveport, and Walter L. Gleason, of New Orleans (Pujo & Williamson, of Lake Charles, of counsel), for appellant. McCoy, Moss & Knox, of Lake Charles, for appellee.

Statement of the Case.

MONROE, J. Plaintiff alleges that it "is the true and lawful owner and entitled to the exclusive right to recover all sunken pine logs or timber to be found in the Calcasieu river and its tributaries, in Louisiana,

bearing the various marks and brands, * * * as shown by the statement" attached to and made part of the petition; that same were acquired by bills of sale, for valuable considerations, and that it has never relinquished or abandoned its ownership or rights thereto; "that the J. C. Stout Lumber Company of which J. C. Stout·is the owner, * * * in bad faith and with knowledge of the claim of ownership of petitioner and its rights to possession, * * * without demanding compliance with the laws, * * * illegally acquired, by purchase or otherwise, from various parties, whose names are shown by annexed statement, * * * 2,731" of said logs, "and wrongfully converted same to their own use, although they had acquired no title thereto, each of said pine logs or timber bearing petitioner's marks and brands * * * and being its property * * *; that your petitioner is entitled to be declared the owner of said described logs or timber, and to recover possession thereof, and, in default thereof, from the inability of defendant to return the same, to recover the value of said logs or timber in a manufactured state, as damages." And there is a prayer for judgment accordingly; the aggregate amount claimed as damages being $9,285.40, with interest.

There being no such corporation as J. C. Stout Lumber Company, the defense has been assumed by J. C. Stout, who answered, denying that plaintiff ever acquired the ownership or possession of the logs designated in the petition, alleging that all the sunken pine logs acquired by him (defendant) had been abandoned by the original owners, and were so acquired, in good faith and open market, for a valuable consideration; that the logs were abandoned in fact and within the contemplation of section 15 of the act of Congress of March 3, 1899, c. 425, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543); that the alleged acquisitions by plaintiff were disguised donations, and were void for want of delivery of the property, and because·not in the form prescribed by law. And defendant pleaded the prescription of one year, and further pleaded to the jurisdiction of the court with respect to the items of ·plaintiff's demand, involving less than $50. Plaintiff thereupon set up a plea of estoppel, alleging that defendant had entered into an agreement with other millowners whereby he had bound himself not to buy sunken logs which might be raised by persons engaged in that business, and that he cannot now be heard to say that such logs were abandoned. The case was tried upon its merits before a jury, and there was a verdict and judgment for defendant, from which plaintiff prosecutes this appeal.

We find the facts of the case, as disclosed by considerable documentary evidence and the testimony of 124 witnesses, to be as follows:

The Calcasieu river is a navigable stream, upon which, and upon the tributaries of which, logging operations have been carried on from a period far beyond the memory of the oldest inhabitant, and one of the recognized incidents of those operations has been the loss resulting from the sinking of a certain, or uncertain, proportion of the logs to the bottoms of the stream, where until within the past few years, they have been allowed to remain undisturbed, for the reason that those engaged in the business found it cheaper to cut and float another log than to attempt to raise a "sinker." The witnesses say that, until within, say, the last 10 years, the loss from the sinking of logs amounted to about 10 per cent. of the whole number floated, and that, since then, it has amounted to 25 per cent. or 30 per cent. in consequence of the floating of smaller and inferior logs. It is shown that defendant has been doing a comparatively small business, but it is never-

theless estimated that, within the past 12 or 15 years, he has cut some 70,000,000 feet of lumber, and, as a number of other millowners are mentioned, including plaintiff, who, as we infer, have cut much more, it will be understood that, within the period mentioned, many hundreds of millions of feet of logs have found their way to the bottoms of the streams in question. Beyond that, it is an accepted fact, and has been testified to, that logs submerged in water will remain sound for an indefinite period—100, perhaps 1,000 years—so that the logs which have sunk in the Calcasieu and its tributaries within the past 50 years have merely been added to those which had been lost by the fathers or predecessors of the present generation of loggers during the 50 years which preceded. The millers, as we gather from the testimony, obtain their logs mainly either by employing men to cut them upon their (the millers') own lands and to deliver them at some point in the main river (usually the mouth of the tributary from which they are floated), or the logger cuts them from land belonging to himself, sells them to the miller, and makes a similar delivery. The logger has his own brand, and usually more than one, and the evidence shows that, operating, as they do, upon different streams, or, at different times upon the same streams, more than one may use the same brand. In fact, several of the brands claimed by plaintiff are shown to have been used by quite a number of the loggers; some of them are shown to have been used by men who died long ago; many of them are of a character such as have probably been used since the first logs were floated; and there has been no attempt to show that a "sinker" 5 or 10 years old could be distinguished from one which had been lying in the water for 50 years.

Again, it appears that, when the logger delivers his logs to the miller, in the main stream, at the mouth, we will say, of the creek or bayou from which they have been floated, he is paid for them, the miller takes possession of, and places his receiving mark upon, them; they become his property, and he assumes the responsibility of floating them to his mill, and of losing sinkers by the way. Whilst, therefore, it is no doubt true that many logs bearing the brands of the loggers by whom they were cut and floated have sunk whilst the loggers still owned them, particularly in the creeks and bayous, it is equally true that many others, and perhaps a majority, of those found in the main stream have sunk after the loggers have delivered them to the millers and have received the price. Hence the mere fact that a "sinker," raised from the bottom of a stream, bears the brand of a logger falls considerably short of proving that it belongs to him, or belonged to him when it sank. The consensus of the testimony, however, is to the effect that a sinker was considered the property of him who raised it from the bed of the stream in which it had sunk, no matter what brand it bore, and, at some time prior to 1903, as good, available timber was, perhaps, becoming scarcer than it had been, some of the loggers turned their attention to the raising of those which had sunk, and equipping themselves with suitable appliances, made a regular business of it, and the raised sinkers were purchased as commonly and as openly as any other logs. Plaintiffs' mill was not so well situated for getting logs in that way as some of the others, and in September, 1903, therefore, it procured the signature of nine other concerns, that were interested in the business, to an instrument reading as follows:

"Lake Charles, La. Sept. 26, 1903.

"All persons are notified not to raise sunken timber in Calcasieu river or its tributaries having our brand or brands, without our special authority, under penalty of the law. We also agree not to buy any sunken timber from log raisers until we have arrived at some mutual agreement as to the price and division of the same."

The first five lines above quoted appear to have been published in a Lake Charles newspaper on October 20, 1903. And thereafter, with entire unanimity, the signers proceeded to disregard both their published notice and their agreement.

The president of the plaintiff company gives the following, with other, testimony:

"Q. What has been your intention in regard to the sunken timber? A. Well, my intention was to have it raised. My intention was this: That, when we signed the agreement not to buy the sinkers or authorize anybody to raise them, till we have an understanding, it was to get together and agree on a fair price for buying the timber raised; then any of the mills that wanted the timber could bid on it, just like they would on the open market, and, whoever paid the most` [should] settle with the log men for what was agreed to be paid them, and the balance settle with the people that owned the brand. That was my aim when this agreement that was signed there was started out. Q. Have you ever bought any one else's sinkers since that agreement, Mr. Bel? A. Not to my knowledge. Unfortunately for us, we are situated where we don't get a chance at the sinkers. Q. What is that? A. Well, it is a little too far around; coming through the lake, I suppose; boats that raise sinkers could never come through the lake, except in those times when very calm. Q. How are the other mills situated in regard to your location; are they above you on the river or below? A. Above us; yes. Q. You are the last mill south, with the exception of Lock-Moore & Co., on the river? A. Yes.

"Cross-examination: Q. Mr. Bel, are you sure that you haven't bought any sinkers since 1903, when this agreement you referred to was signed? A. Not to my knowledge. Q. You had bought sinkers before that time, had you not? A. Not as a regular proposition; no. Q. But, as a matter of fact, you had bought some, had you not, before that time? A. I may have; yes. * * * Q. State from whom you had bought sinkers before the signing of this agreement you refer to, that you can refer to now. A. I can't tell anybody who I bought some from; I will acknowledge it, if it is a fact. * * * Q. Do you remember whether or not Zepherine, commonly called 'Baby,' Buller raised any sinkers and delivered them to you since 1903, since the date of the agreement? A. No; I don't know; I am willing to acknowledge it, if so. Q. Didn't you buy sinkers also from Sol Lee since that agreement was signed? A. Not that I know of. Q. Didn't you buy sinkers also, since that agreement was signed, from J. G., commonly called 'Sug,' Reeves? A. I don't know. Q. Didn't you buy sinkers, since that agreement was signed, from

Coleman Lyles? A. I couldn't say. Q. You don't recall whether you have or not? A. Well, I will tell you; I haven't paid much attention to the mill business since the dates you mentioned. Q. Since 1903? A. 1903. Q. That was nine years ago? A. Probably I might have done it then. Q. You might have bought since that time? A. I thought you meant since we signed the agreement. Q. 1903 is when you signed the agreement? A. Well, probably I have, I don't know. Q. Probably you have? A. Yes; I don't know. Q. Then you don't recall whether or not, in the last nine years, you have bought sinkers from people on the river? A. No; I couldn't recall. Q. You don't remember? A. No."

Corroborating the admission fairly deducible from the foregoing testimony, there were 15 witnesses who testified, without attempt at contradiction, that they were employed by plaintiff to raise sinkers for it, and that, according to their instructions, they raised, and delivered to plaintiff, all that they found, without regard to the marks or brands; two or three of them testifying that, among the sinkers so raised and delivered, were some that bore the receiving marks of the defendant. In the meanwhile—beginning in 1906—plaintiff had undertaken, through Mr. T. N. Hewitt, one of its employés, to acquire from different loggers what it conceived to be their sinker rights, and the transcript contains some 40 or 50 bills of sale reading (mutatis mutandis as follows:

"State of Louisiana, Parish of Calcasieu. Know all men by these presents, that I, Jim Nevils, a resident of said parish and state, for and in consideration of the sum of ($1.00) one dollar cash, to me in hand paid by J. A. Bel Lumber Co., Ltd., * * * have bargained, sold, and conveyed, and do, by these presents, grant, bargain, sell, transfer, and convey unto the said J. A. Bel Lumber Co., Ltd., all the sunken timber in logs in the Calcasieu river, or its tributaries, which I now or may have owned, or any interest I may have therein, branded NE — NE — ˙NE — PNX. And do hereby authorize the said J. A. Bel Lumber Co., Ltd., its employés, to take possession of the said logs at any place they may find the same in the Calcasieu river or its tributaries, and subrogate them to all rights to recover the same or any portion thereof which I possess. To have and to hold the same into the said J. A. Bel Lumber Co., Ltd., or its vendees or assigns.

"Witness my signature hereto at Lake Charles, Louisiana, in the presence of T. N.

Hewitt and M. J. Perkins, competent witnesses, on this 2d day of February, A. D. 1906.

"Jim X Nevils.
    his
    mark

"Witnesses.
    "[Signed]  T. N. Hewitt.
    "M. J. Perkins."

Jim Nevils, by whom the above-quoted instrument was executed, examined as a witness for defendant, testifies as follows:

"Q. How long did you log, and in what streams did you put your logs? A. About 25 years. I put my logs in the main river and in Bunch's creek. Q. What brands did you use? A. I used the following brands NE — INE, and PNX with my brother, Pierre Nevils. Q. Did you ever use NE brand? A. Yes. Q. How long did your father use NE brand, and when did he die? A. He used it as long as he logged—about 40 years. He died about 3 years ago. He quit logging about 12 years ago; I don't know exactly. Q. Did you sell the NE brand to Mr. Hewitt or the plaintiff? A. No; I sold them the NE. Q. When a log sank to the bottom of the river, to whom did you consider it belonged, after it was raised? A. I always considered that the log belonged to the man who raised it. Q. Did you make any claim to logs after they sank and were raised by some one else, when they had your brand on them? A. No, sir; I never did. Q. When you signed the bill of sale marked 'P 2,' for identification, what did you understand about sinkers mentioned in it? A. I suppose I did not understand it as I ought to have. I asked Mr. Hewitt about it, and he said it would not amount to anything; that it would not interfere with me raising sinkers, as well as I recollect. I was working for Mr. Hewitt at the time.

"Cross-examination on behalf of the plaintiff: Q. Were not all the brands on the bill of sale on it when you signed it? A. No, sir. Q. Please examine bill of sale and state which one was not. A. I sold only this one, NE. Q. You went out of the logging business about that time, did you not? A. I sold my logging business to Mr. Hewitt about nine years ago. Afterwards, in about two years, I went back into the logging business for myself, and made use of the NE brand. This was after I had signed the bill of sale. I never used the NE brand on logs before I signed the bill of sale. I think I sold nearly all the logs with the NE brand to plaintiff, but about 200 logs in this brand (sold) to Hodge Fence & Lumber Company (were), cribbed at Jones Bluff before I signed the bill of sale. Q. Did you ever object to the raising of sinkers in any one of the brands belonging to you when the party raising them had no logs in the river, or had not your consent to raise them? A. No; I never did make any complaint about it. Q. During the time you logged, it was cheaper to cut a log and put it in the water than it was to raise a log, was it not? Is that not why you paid no attention to them? A. I sold my logs at the landing where I put them in. Until about ten years before I quit logging people did not know how to raise logs, and it was expensive, and we paid no attention to it. Later they adopted other methods, and it was cheaper to raise logs than to cut them and put them in.

"Redirect by defendant: Q. Did you ever raise any logs for Mr. Hewitt and the plaintiff in this case? A. Yes; I raised logs from Phillips Bluff down to Jones Bluff for the plaintiff, for about two years; this was about seven or eight years ago. (Mem. by Court: The testimony was taken January 20, 1913.) Q. What brands were you ordered to raise those logs in? A. I had no order about brands. I was not [out?] on the river for plaintiff and I raised all the sinkers I could get. It made no difference what brand they had. During this time, I believe I raised logs with my own brand on them. I was paid for my work, sometimes by the day and sometimes by the log. I never raised any logs belonging to Mr. Stout that I knew of. The bill of sale was read to me before I signed it.

"Recalled by plaintiff on cross-examination: Q. When you sold your logging business to Mr. Hewitt, was he not representing plaintiff, to your knowledge, and did not the sale include all the floating timber in the brands used by you up to that date, in the river at the time of delivery? A. Yes; I knew he was buying for plaintiff, and I sold all the logs floating in the river at that time, at Indian Village. Some logs marked with the NE brand were included in this sale. Q. Some of those other brands might have been in that bill of sale when it was read to you and you do not remember it, could they not? A. No; my memory is not quite that short. It has been about ten years since I used one of the partnership brands. Q. Mr. Nevils, did you not crib all your timber at the place it was put in, and make delivery of the same at Jones Bluff, in the NE brand, when you commenced logging, after you sold out to plaintiff? A. Yes."

Bill of sale marked "P 3," was executed by John W. McFatter, and purports, for a consideration of $5, to convey his rights in 13 brands. Called as a witness by defendant, he testified that he had logged in the Calcasieu river and its tributaries for about 20 years, but had retired from the business some 10 or 12 years before (or, say, in 1903 or 1901), and has been living in Texas for 8 years (or since 1905); that, when he moved to Texas, he abandoned all logs left by him in the streams mentioned. His attention was

then called to Exhibit "P 3," and he was asked whether he had ever used the brands reproduced therein, and his answer and further examination proceed as follows:

"I never used or bought any logs in the following brands, viz.: (He then specifies four of the brands which appear in the exhibit.) I do not remember ever buying any logs in or using the following brands: (He then specifies four other brands which appear in the exhibit.) I bought some logs in the PN brand. HA is my own brand, which I used in Bayou Serpent and Bundick's creek. Q. When you signed document marked 'P 3,' what brands were in it? A. I did not see any in it when I signed it. I told Mr. Hewitt, at the time that I signed this document, what my brands were, but also told him that I did not know in what brands I had bought logs; that he knew as much about it as I did. When he paid me $5, as a consideration for this sale, for the sunken logs that I had, I told him I would take it because I considered it like picking it up.

"Cross-examination: Q. What brands on the bill of sale did you really sell, to the best of your recollection now? A. I sold logs I owned under the AB, HA, and PN brands. I never noticed any brands on the bill of sale when I signed it. I could not have sold brands that I never owned. At different times I have sold to the following parties, in these brands, viz.: To plaintiff, to W. B. Norris, to Ryan & Geary, to Perkins & Miller, to Stewart & Merriman, to Menefee Lumber Company. * * * At different times I bought a great many logs from different parties, in various brands. I remember the following: ED, W, NA. I could sit here and think of others probably. At the time I signed the bill of sale, I reckon I read it, but I do not remember. I told Mr. Hewitt I could give him my brands, the brands that I used, but the brands that I bought logs in I could not give him; that he knew them as well as I did. * * * I am engaged in the cattle business in Texas, and have not bothered my brains with my logging operations since I lived in Texas, for the past eight years. * * * Q. Have you sold logs for other people to the plaintiff company? A. Yes; I run other people's timber for them, at times, turned it over to plaintiff, collected the money, and paid it to the owners of the timber. At times I told plaintiff, who owned the various brands in the run, and sometimes, I reckon, I did not, but collected the money and settled with the owners."

The consideration expressed in all of the bills of sale exhibited by plaintiff was merely nominal, and those by whom the bills were executed, who were examined as witnesses, testified, without exception, so far as we now recall, that they never had any intention of attempting to raise any sunken logs which may have belonged to them, and had no objection, and interposed none, to the raising of them by others; though two or three of them, perhaps, seemed to think that persons who had never put any logs into the streams, or who had quit logging, should not be permitted to take any out. Their idea seems to have been that, if plaintiff chose to pay them—whether $1, or $2.50, or $5—for any interest they might have had in such logs, it was so much "picked up," as Mr. McFatter has expressed it. In July, 1908, plaintiff stationed George Green and Charles Materne (one at a time) at defendant's mill, with instructions to note the brands upon all sinkers purchased by defendant and delivered at the mill, and the statement annexed to the petition, and which, on the trial, was marked "P 46," is said to show an aggregate of 2,731 logs, bearing some hundreds of different brands. Green and Materne were not informed of the purpose which plaintiff had in view, nor as to the brands with reference to which plaintiff pretends to have acquired the rights here set up; and, whilst they appear to have noted all of the loggers', or original owners', brands on the logs purchased by defendant, we do not understand that they noted the receiving marks which may have been placed upon any of the logs, and which would have indicated that they had been delivered to, and had become the property of, one or the other of the millers. It appears, too, from the testimony of Green and Materne and of others, and the fact is unquestioned, that the sinkers so acquired by defendant were cut into lumber immediately; so that, when plaintiff instituted this suit, upon, say November 8, 1912, it knew that the logs to which it asserted claim were not in existence; from which it follows that the only claim which it could seriously, or in good faith, have asserted was the alternative claim for damages, al-

leged to have been sustained by reason of defendant's acquisition *and conversion* of the logs.

Some time after the institution of the suit, plaintiff entered a remittitur, reducing its claim by deducting logs included in a certain Exhibit "P 47," as follows:

```
By deducting  77 logs claimed as raised in
                    1908, valued at..........  $ 262 00
    "      "   266 logs claimed as raised in
                    1909, valued at..........    904 00
    "      "   221 logs claimed as raised in
                    1910, valued at..........    751 00
    "      "    12 logs claimed as raised in
                    1911, valued at..........     41 00
    "      "    30 logs claimed as raised in
                    1912, valued at..........    102 00
                                               ----------
Total logs.....606     Total value........ $2,060 00
```

The suit appears to have been instituted on November 8, 1912, and, according to Exhibit P 46, there were only 301 of the sinkers in question that were acquired by defendant within the year preceding that date, from which, if we deduct 42, included in the remittitur, as having been so acquired in 1911 and 1912, there would remain 259 of the sinkers, with respect to which the plea of prescription would not apply. We should find some difficulty, however, in the identification, since the document filed with the remittitur purports to identify no logs acquired in 1911, and only 10 as acquired in 1912.

### Opinion.

[1] It will be seen, from the foregoing statement, that, with respect to the logs referred to in the petition, all save 259 had ceased to exist, to the knowledge of plaintiff's agents, more than a year prior to the institution of this suit; and hence that, as to them, the action is one sounding in damages for the alleged tortious conversion of the property of another.

In the case of Shields v. Whitlock & Brown, 110 La. 714, 34 South. 747, plaintiff alleged that defendants had trespassed upon his land and had cut and removed his timber, and his demand for the value of the timber as damages was met by the plea of prescription of one year, as against which his counsel argued that there should be a difference in the application of the prescription between the claim for damages resulting from the trespass and the claim for the value of the timber. It was said by the court:

"We feel very much inclined to the view that there ought to be such a difference, but it does not seem to be recognized by the law or the jurisprudence of this state.

"Personal actions arise from offenses, as when one has become liable to another for injury he has inflicted on him by some crime or offense, such as theft or slander. Code of Practice, art. 31. Such actions—i. e., actions for damages resulting from offenses—as also actions resulting from quasi offenses, are prescribed in one year. Civ. Code, art. 3536."

And it was held that the action became prescribed at the expiration of one year from the date upon which the timber was cut and removed, even though plaintiff may not have learned of the offense until afterwards.

In support of the conclusion so reached, the court cited the case of De Lizardi v. N. O. Canal & Banking Co., 25 La. Ann. 414; and referred to the fact that Act No. 33 of 1902 (p. 41) had not been passed until after the institution of the suit. Other cases to the same effect are: Williams v. Greiner, 20 La. Ann. 151; Edwards, Curator, v. Ballard, 20 La. Ann. 171; Wood v. Harispe, 26 La. Ann. 511; Antrim Lumber Co. v. S. H. Ballinger & Co., 121 La. 306, 46 South. 337; Thomas v. Whittington et al., 127 La. 551, 53 South. 860; Davis et al. v. Ruddock Orleans Cypress Co., 132 La. 985, 62 South. 114; Lovell v. Cragin, 136 U. S. 131, 10 Sup. Ct. 1024, 34 L. Ed. 372. Act No. 33 of 1902 (p. 41), it may be remarked, amended C. C. 3537, only by declaring that:

"Where land, timber or property has been injured, cut, damaged, or destroyed (the prescription of one year runs) from the date knowledge of such damage is received by the owner thereof."

[2, 3] In the instant case, plaintiff had two men employed whose sole duty it was to observe and make a record of the deliveries of sinkers to defendant, and it is upon that record that this suit is predicated.

Beyond that, the two men have testified that the sinkers were cut into lumber as soon as received, so that, even if it were conceded that an action for the sinkers would not be prescribed, knowledge of the fact that the sinkers to which we are now referring had ceased to exist is shown to have reached plaintiff, through its agents, more than a year before its present claim for damages was asserted. The claim, as to those sinkers, is therefore prescribed. As to the logs (say, 301) shown to have been acquired by defendant within the year preceding the institution of the suit, we find it impossible, after making the deductions called for by the remittitur—of 12 logs acquired in 1911, and 30 acquired in 1912—to determine which of those that remain are now claimed by plaintiff, since it has identified, by the brands, only 10 of the 42 which are included in the remittitur, and we have no means of identifying the others. Beyond this added element of uncertainty, there are those to which we have referred in the statement of the case. A majority of the brands reproduced on Exhibit P 46, as appearing on logs purchased by defendant within the period in question, have been shown to have been used by others, and, in some cases, by many others, than those from whom plaintiff has assumed to have acquired them. In other cases, even though the logger from whom plaintiff holds a bill of sale may have been the only person who used a particular brand, the evidence affords no reasonable assurance that logs bearing such brands belonged to him when they sank, since they may have sunk after he had delivered them to the miller and received the price. Again, it is evident, as shown by the testimony of Nevils and McFatter, that plaintiff's agent, in an excess of zeal, has included in some bills of sale brands in which the signers of those bills had no rights and in which they intended to sell none; and, even where only their own brands are specified, it does not follow that plaintiff acquired title to all the sunken logs so marked, since the evidence shows that the logs were probably sold before they sank. And, finally—and this consideration applies to some 28 logs, bearing plaintiff's brand or receiving "hack," which appear to have been included among those acquired by defendant between November 14, 1911, and November 8, 1912—the evidence shows that, while plaintiff had men employed to check up the sinkers purchased by the other mills, with a view to the institution of this suit, it had men employed to raise sinkers, who were instructed to raise all they could get, without regard to their marks or brands, and several of those men have testified that sinkers bearing the brand or receiving mark of the defendant were included among those raised by them and delivered to plaintiff. There is somewhere, in the mass of the testimony, a statement to the effect that, in paying for sinkers, plaintiff reserved or withheld something for the supposed owners, but there is nothing to show that any payments were made to such owners, that any accounts were kept upon the basis of which such payments could be made, or that such supposed owners have ever been advised that plaintiff is holding any balances to their credit. In fact, as appears from our statement of the case, plaintiff's president denied all knowledge of its acquisition of sinkers, subject to the qualification that he would be willing to acknowledge such as were brought home to him, and to the eventual qualification that he was absent a great part of the time of late years, and knew nothing about it. The fact remains

that plaintiff and the loggers and all the other lumber concerns in Calcasieu parish had always, in the past, accepted, and acted upon the common understanding that a log which had sunk to the bottom of a stream was to be regarded as derelict and abandoned, and became the property of him who put himself to the trouble and expense of raising it. Finding that, by reason of the situation of its mill, the understanding did not operate to its advantage, plaintiff, in 1903, made an effort to put an end to it. The effort failed and thereafter, if we are to judge from the evidence in the record, plaintiff became more extensively engaged in the raising of sinkers than any other single concern. It then attempted, in the manner which has been stated, to acquire what it seems to have assumed to be, the most extensive sinker rights, and, upon the basis of such supposed acquisition, undertook to gather testimony with a view to the bringing of this suit. It, however, gave no notice of such purpose; and, during the period between July 25, 1908, and September 30, 1912, when its men were stationed at defendant's mill, checking defendant's purchases of sinkers, though it was itself engaged in raising sinkers, though it knew that many others had equipped themselves for, and were engaged in, that business, as a means of livelihood, and though it knew that sinkers were being daily sold, in open market and open competition, to the different mills, it issued no notice concerning the marks and the brands that it now claims to have acquired, or of its intention, at some future time, to bring an action or actions in damages for the doing by others of that which it also was doing. We do not see, under the circumstances stated, how this action can be maintained. There are probably hundreds of thousands of logs in the Calcasieu river and its tributaries to which plaintiff has not the shadow of a title,

and the business of raising them is a perfectly legitimate one. More than that, in view of the common understanding, generally acted upon, that a sinker was to be regarded as abandoned, and became the property of him who raised it, the fact that the sinkers which were raised bore one brand or another di not make the business illegitimate. so long as the one who railly owned the sunken logs gave no notice, by word or deed, of an intention to preserve his rights.

[4] Abandonment of property, like abandonment and acquisition of domicile, is made up of the two elements—intention and action or inaction. 1 Cyc. p. 4; Log Owners' Booming Co. v. Hubbell, 135 Mich. 65, 97 N. W. 157, 4 L. R. A. (N. S.) 573, and note. And the intention to abandon may be inferred, in a case such as this, where the owner makes no effort, and takes no action, looking to the recovery of his property, and particularly where he, himself, acts upon, and profits by, a common understanding to the effect that property such as is here in question is to be regarded as abandoned.

In Creevy v. Breedlove, 12 La. Ann. 745, it was said by this court:

"The property sunk in the steamer Tennessee, having been unclaimed for 23 years, was clearly derelict. The plaintiffs had a right to attempt its recovery by means of their diving bells and wrecking apparatus."

To much the same effect was the decision in Eads v. Brazelton, 22 Ark. 499, 79 Am. Dec. 88. See, also, the decisions in McGoon v. Ankeny, 11 Ill. 558, and Haslem v. Lockwood, 37 Conn. 500, 9 Am. Rep. 350. In some cases it appears to have been held that, if the intention to relinquish the property exists, for ever so short a time, the abandonment is complete (Judson v. Malloy, 40 Cal. 299; Davis v. Butler, 6 Cal. 510); and that, the abandonment having once taken place,

the owner loses his title, and cannot, by change of intention, resume it. Derry v. Ross, 5 Colo. 295; 1 Enc. of Ev. Verbo. "Abandonment."

In the instant case, the parties from whom plaintiff assumes to have acquired have testified, almost without exception, that they had no intention of attempting to recover any sunken logs which they may have owned; and it was upon the faith of the consensus of opinion that such logs were abandoned—an opinion that was accepted and acted upon for years—that men equipped themselves with boats and apparatus and entered upon the raising of such logs, as a business. Plaintiff was no doubt interested in raising its own logs, but its raising and retention of the logs of others can be justified only upon the theory that it, too, acquiesced in the generally accepted opinion to which we have referred; and we conclude that its action in the premises authorized the presumption that it had so acquiesced. Defendant, by answer to the appeal, prays that the judgment be so amended as to make it clear that he shall be allowed to recover the entire costs to which he has been subjected in the summoning and examination of witnesses to meet the multifarious demands set up in the petition, and we are of opinion that he is entitled to that relief.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be so amended as that plaintiff is condemned to pay all costs incurred by defendant in defense of this suit, whether for witnesses or otherwise, the same to be taxed by the court a qua. It is further decreed that, as thus amended, said judgment be affirmed.

BREAUX, C. J., dissents.

PROVOSTY, J., absent on account of illness, takes no part.