## EADS ET AL. VS. BRAZELTON.

A steam boat and cargo having been sunk in the Mississippi river for a period of nearly thirty years, and during that time, an island having been formed, by the changing of the current of the river, over the wreck, and the owners having made no effort, nor done any act showing that a design was entertained to save the property, the law would imply an abandonment of it.

The finder of a wreck, as such, would be entitled to the property as owner, or to its possession as salvor, and would be protected from the interference of third persons with his possession.

Property is said to be abandoned when it is thrown away, or its possession voluntarily forsaken by the owner, in which case it will become the property of the first occupant. When involuntarily lost, or left without hope or expectation of again acquiring it, it becomes the property of the finder, subject to the superior claim of the owner, on the payment of salvage in admiralty cases.

The occupation or possession of property lost, abandoned, or without an owner, to constitute a good title by occupancy, must depend upon an actual taking of the property, and with the intent to reduce it to possession: And so where the claimant had marked trees on the bank of the river, and placed buoys over the wreck, to indicate the place where it lay—those acts only indicate a desire or intention to appropriate the property, and are not—as placing a boat over the wreck, with means to raise it, and with persistent efforts to do so, would be—such acts of possession as the law would notice and protect.

Where an injunction has been issued and served upon the defendant, the court may well impose a fine upon the defendant, for contempt, in disobeying the process of the court; but not as damages to the complainant for any supposed injury to him in consequence of such disobedience.

*Appeal from Mississippi Circuit Court in Chancery.*

Hon. GEORGE W. BEAZLEY, Circuit Judge.

FOWLER and STILLWELL, for the appellant.

Appellee acquired no right to the lead by his discovery without possession. 2 *Bl. Com.* 78, 258, 345; *Just. Inst. Lib.* 2;

*tit.* 1, *sec.* 13; *Pierson vs. Post,* 1 *Caines' Cases,* 175; *Wallis vs. Mason,* 3 *Binn. Rep.* 546; *Bro. Ab. title Property,* 37; 7 *John. Rep.* 16; 20 *Ib.* 75; *Cooper's Just. p.* 443, *n.* 18.

WATKINS & GALLAGHER, for appellee.

As between the parties here, (the defendants making no claim to the property as its owners, but admitting the complete abandonment thereof,) the complainant is entitled to all the rights and remedies of *owner,* by virtue of his finding and possession. Goods actually lost by the owner and unreclaimed, or designedly abandoned, belong to the finder. 1 *Black. Com.* 296; 1 *Stewart's Ala. Rep.* 320; *Strange,* 505. In the case at bar, there can be no question as to the property being abandoned and derelict. *Wyman vs. Hurlburt,* 12 *Ohio,* 81.

By the finding, and his acts towards taking possession, Brazelton became the owner of the wreck—and it did not require, under the circumstances of the case, that he should take it into actual manual possession to complete and perfect his title, so that he did not abandon that *finding.* He did not abandon it, for the proof is that he fixed his buoys to it, etc., marking out its locality, not only to himself, but to the public; and remained near it, making preparations to work the wreck as best he might, on the first opportunity to do so, with the means then under his control. This *finding,* and these acts, gave him the ownership of, or property in the wreck; and the right to unite by actual seizure, the right of possession to his right of property, no one could gainsay, until he had manifested his intention not to unite the two rights; which he never did, but, on the contrary, manifested his intentions of uniting the two rights by preparing to take actual and exclusive possession as soon as his circumstances, and the river would permit.

At any rate, the finding coupled with the acts done by Brazelton towards and with the intent of taking actual possession of the wreck, are sufficient to vest the property in him as the finder. 1 *Parson on Cont.* 443; *Parson on Mer. Law,* 50; 2 *Bl. Com. p.* 9.

Mr. Justice FAIRCHILD delivered the opinion of the Court.

When things that become property from being appropriated are the property of nobody, are in a state of negative community, the first finder may reduce them to possession, which is a good claim, and under the name of title by occupancy is regarded as the foundation of all property. 2 *Blk's. Com.* 3, 258; 1 *Bouv. Am. L.* 194, *No.* 491; *Pothier Droit De Propriete, Nos.* 20, 21; *La. Civil Code, Art's* 3375, 3376.

Hence, wild animals, that are not property in their natural condition, may be captured, will belong to the first taker by occupancy, and will so belong while in the keeping of the taker, or person claiming under him, or while in domestication. 2 *Kent.* 348; *Coop. Just. Lib. II. Tit. I. sec.* 12; 1 *Bouv. Am. L.* 194, *No.* 492; *La. Civil Code, Art.* 3379.

So, the finder of things that have never been appropriated; or that have been abandoned by a former occupant, may take them into his possession as his own property; and the finder of any thing casually lost is its rightful occupant against all but the real owner. 1 *Blks. Com.* 295; 2 *Ib.* 3, 9, 402; 16 *Vin. Abr., Possession F.* 3; 1 *Domat's Civil Law, by Cushing,* 856, *No.* 2155; *Coop. Just. Lib. II, Tit. 1. sec.* 18; *La. Civil Code, Art's* 3,383, 3,384; *Pothier Droit De Propriete, Nos.* 58, 60, 267; *Armory vs. Delamirie,* 1 *Strange,* 505; *Brandon vs. Huntsville Bank,* 1 *Stew.* 342, 344; *Eastman vs. Harris,* 4 *La. Ann. R.* 194.

The bill in this case is founded upon a right of occupancy which Brazelton, the plaintiff, insists was vested in him by his discovery of the wreck of the steam-boat America, and by his intentions and acts relating thereto. Because this right was not respected by the defendants, partners and servants of a firm of wreckers doing business in the Mississippi river and its tributaries, under the style of Eads & Nelson, Brazelton filed his bill on the chancery side of the Circuit Court of Mississippi county, to obtain the protection of the court, to relieve him from the interference of the defendants in his own intended

labors, to recover the property in the wreck, and to obtain compensation for what they had taken therefrom.

From what is before us it may be taken as shown in the case that, in November, 1827, the boat named sank in the Mississippi river, within the limits of Mississippi county; that, of her cargo, shot and bundles of bar lead of an unascertained quantity, and lead in pigs to about the number of three thousand, remained in the river, wholly abandoned by the owners; that Brazelton, having information of the place where the boat sank, proceeded, in December, 1854, to ascertain its exact locality in the bed of the river, with the view of raising the sunken lead; that, in January 1855, he arrived at the vicinity of the wreck, with his diving boat, to carry out his intention, and fastened a buoy to a weight that rested upon the wreck, with the expectation of putting his boat over it the next day, but that he was detained by other business, and by the difficulties and dangers of the work in the existing state of water, with boats like his, and by the necessity for making repairs upon his boat, and apparatus for raising the cargo, till the defendants, upon the 28th of September, 1855, caused one of their boats to stop at the shore near the wreck, to search for and find it, to place their boat over it, and to commence raising the lead.

The quantity of lead raised by the defendants was stated in their answer, and applying the price thereto, as shown by the evidence, its value was found to be four thousand, five hundred and seven dollars and ninety-six cents, for which sum the court below gave a decree, perpetuated the preliminary injunction which was granted at the beginning of the suit, and which arrested the defendants in their labor upon the lead.

After the injunction had been served, and the defendants, in obedience thereto, had withdrawn their boat from the wreck, and while the plaintiff in his turn, was engaged in bringing up the lead left by the defendants, they brought their boat back near to the plaintiff's boat and anchored, thereby obstructing his operations, for which two of the defendants that were within the jurisdiction of the court, were brought before it for contempt

in disobeying the injunction, and were fined one thousand dollars, which was, by order of the court, paid to the plaintiff for his damages from the obstruction.

The defendants appealed, and contend here that the injunction was illegally granted, for being granted by the judge in vacation, that it was issued against acts for which a legal remedy was the only proper one to be pursued, and upon a case that failed to show a right to the plaintiff to any relief, and that the decree is for a sum too large, in being for the gross value of the lead without any deduction for the expense of its being raised. Questions are also made upon the testimony.

The foregoing summary, although it may embrace all, or the more important of the facts upon which the injunction was obtained, and which must be the grounds of final relief, is intended, as was in effect stated, to be a recapitulation of facts, either admitted or established, and not a statement of allegations that were not proved or were disproved, or of testimony that was insufficient to establish the positions for which it was adduced, or that was neutralized or overthrown by counter evidence. But as the principal ground of controversy in the case, and one that may supercede all others, is Brazelton's right of occupancy of the wreck by finding, and as that may depend upon its possession, the pleadings which allege and deny the possession, and the facts relative to this issue may well be subjected to closer scrutiny.

When Brazelton found the wreck he traced lines to it from different points on the Arkansas side of the river, so that their intersection would show the situation of the wreck, and the lines were indicated by marks upon the trees. It was upon the return of Brazelton from St. Louis with his bell boat that a float or buoy was placed by Brazelton over the wreck, and this was done with the intention of signifying the place to which the diving boat was to be dropped the next morning. It was not to be expected that such objects would remain permanent fixtures, as the wreck was in the main channel of the river, and it is evident that Brazelton considered them as guides to the sit-

uation of the wreck, as the marked trees were, as he stated to Seth Daniel, in the presence of Reese Bowen, that it would make no difference if they should be washed away, as he could find the wreck from the ranges of his lines. Brazelton does not pretend to have put his boat over the wreck, or to have had any claim to the wreck but by occupancy, which depended upon his finding it, upon his providing means for easy approaches to it by land-marks, and floats upon water, and upon his being in the neighborhood of the wreck from January to the last of September, without any other appropriation of the wreck, but with a continual assertion of his claim, and with the intention of making it good by future action. This, doubtless, he would have done in the winter of 1855, had not the sinking of the steamboat Eliza afforded the opportunity of other work to which he confined himself till June. Then he would have applied himself to the America, but the periodical rise of the river at that season prevented him from so doing, and when he was nearly ready, with his boat and machinery in order for effective labor, with favorable water for work, safe from rafts and flat and coal boats, the Submarine, No. 4, belonging to the defendants, passed him on the 28th of September, and within two days was placed over the wreck, and thenceforward the defendants were its occupants in fact, and claimed to be so by right.

If Brazelton's boat had been accompanied with steam power as was the Submarine, No. 4, the rise of the water in June, or the season of floating boats and rafts would not have been uncontrollable obstructions to his desire to save the lead of the America; and he could, while the boat of the defendants was hovering in the vicinity of the wreck, have placed his own boat over it, and thereby acquired a possession which the custom of the river, as alluded to in this case, would have respected as a right. But it is for us to declare the legal effect of what he did, and not speculate upon the possible result of a different course of action, which he might have pursued had wind and water permitted, and if other business had not called him from the prosecution of his original purpose.

But before examining the law of possession of goods claimed by occupancy, which is the question of the case, two sorts of allegations in the bill may be noticed, which were conceived by the plaintiff to have an effect upon the case, but of which we should need to be convinced, had not the failure of his proofs to sustain the allegations made the effort to convince us unnecessary. They relate to the abandonment or loss of the lead in the river beyond the memory, knowledge or information of boatmen or residents of Mississippi county ; and to the alleged intent of the defendants to overreach the plaintiff in the occupancy of the wreck, and, in finding it, to use his marks upon the trees.

Neither the sinking of the America nor its locality seems to have been so obscurely remembered as the bill supposes. Captain Eads, one of the defendants, told the witness, Cunningham in 1843, according to his recollection that the America was under the tow head often mentioned in the case, which the witness afterwards was satisfied to have been the fact, from his acquaintance with the wreck after the tow head and island were washed away, and the wreck was left in the main river. Cunningham, in 1853, sounded for the wreck, and found it as he believed. Captain Swan, who was upon the America when she sunk, and who had been familiar with the river at the place of sinking from that time, in 1827, till 1854, and who communicated to Brazelton his information of the situation of the wreck, deposed that the bank has in all the time mentioned changed but very little, though the bars have been continually changing, and that from marks upon the bank he knew where the America was, and after the island which had covered the wreck about twenty years, was washed away, he is of the impression that, from the break of the water where he supposed the America to be, he could upon a clear bright day have pointed out the situation of the wreck. From the description of the place given by Captain Swan to Brazelton, he was able to find the wreck, as he afterwards told Swan that his supposition that the break in the water was caused by the wreck, had been verified. And

Captain Swan further said that the pilots of the present time were as well advised, as a matter of news, of the loss of the America in the vicinity where the wreck lay, as the pilots were when she was sunk.

Josiah Sellers, who was a steam-boatman at the time the America was lost, and who passed the wreck a few days after her loss, and who both in going down and returning up the river stopped at the wreck, made such observations that, when the bar was washed away that had protected the shore and hid the wreck, he was satisfied that the America was in the channel of the river, and that the ruffling of the water, which he and Captain Swan saw in the river at that point, was caused by the wreck of the America. And he informed Capt. Eads in 1853 or in 1854, and he believes in both of these years, of the situation of the wreck, giving him the land marks and the break of the water as indications where to find it, as Swan did to Brazelton.

So, in February, 1855, Captain Turner found the wreck, and he says without the assistance of Brazelton's marks.

The witness, Garrett, also referred William H. Johnson to negroes who were probably living on the river when the boat was sunk, and Captain Neaves, of the Submarine, No. 4, almost admits that the information given him by negroes that stood upon the bank when he was searching the water for the wreck hastened its finding.

From these facts, and from every thing in the case, we think there could have been but little difficulty in finding the wreck after the island that had so long concealed it, was washed away, and the labor or good fortune of Brazelton in ascertaining its locality affords no reason for assigning it to him as his property, aside from the legal consequences of its possession, even if courts had the power of such assignment, which we disclaim, and which we do not understand Brazelton to claim but by implication.

With reference to the tree marks of Brazelton it may be said that there is no satisfactory evidence that they were used on the part of the defendants in finding the wreck.

Andrew Skelton says that one of the divers of the defendants showed him marks upon trees, but what or whose marks we do not know. George Young relates that the morning after the boat landed near the wreck, the Captain hired a negro to show him Brazelton's marks, while Johnson Reeves says that on the same morning the Captain offered the negro money to show him where the wreck lay. The language of the Captain to the negro, if the two witnesses were testifying to the same conversation, was very differently understood by them, and we have no means of testing their comparative correctness.

Captain Neaves in his answer denies this, and Johnson, a diver, who seems to be most implicated in the talk on shore at Garrett's, and with Young, and who was referred to the negroes, positively denies that he knew of Brazelton having made any marks, or being in the vicinity; asserts that he was on shore looking for marks, he said, and supposed Turner to have made. He, Turner, had found the wreck while in the employ of the defendants, and had made a chart which is alluded to in the case as a guide to the boat in finding the wreck.

The evidence too is abundant that the defendants, or Capt. Eads, one of them, had knowledge of the place of the wreck, and they aver a persistent intention to have taken up the lead, which the allegations of the bill against them as being extensive, determined and monopolizing wreckers, and the deposition of Turner, confirm.

It is not established that the defendants knew that Brazelton was about to work upon the America, although a witness so inferred from the conversation of the Captain and others of the boat, while there is no room for suspicion that they intended to interfere with any occupancy of the boat by Brazelton, and the whole case is, that they did not do so according to their understanding of Brazelton's right.

But what that right was remains to be determined.

Notwithstanding the point made by the defendant, that Brazelton had no right to the lead which the law would protect, it being the property of the original owners of the cargo, there is

no room for doubt that the lead was abandoned by its owners; and even without the positive testimony of an owner of the boat and cargo in affirmation of the fact, the law would so imply from the term of the loss, and from the fact of its having been covered by an island formed upon it, which sustained trees grown to the height of thirty or forty feet. All reasonable hope of acquiring the property must have been given up from the nature of the case; and the evidence shows that during the two years that intervened between the sinking of the boat and its being covered by the tow head and island, no effort was made or design entertained to save that part of the cargo that was abandoned when the high water interrupted the labor of saving it, that was prosecuted for two weeks after the loss of the boat, save that an excluded deposition mentions that one hundred and sixteen pigs of lead were afterwards got out by residents of the neighborhood. Having saved the specie that was on board belonging to the United States, the furs and one-half of the six hundred pigs of lead, and a part of the shot, with which articles the boat was laden, and the boilers and machinery of the boat, the owners of the America seem to have contented themselves therewith; and to have wholly abandoned the remaining shot and lead.

Unlike *The Barefoot*, 1 *Eng. Law & Eq. Rep.* 664, which was the loss of lead and iron in smacks, in which Dr. Lushington held, that the property was left but not abandoned, because the place of the property was well known, and because the property was unmovable until recovered by human skill, this case, from the length of time that had passed, from the shifting nature of the bars and channel of the river in Plumb point bend, as well as from the testimony of Captains Swan and Sellers, of William H. Johnson, and of Mr. Ruble, an owner of the boat, shows not only that the lead in the wreck was left, but that it was abandoned. But whether the property when saved would have been the property of Brazelton, or of an occupant, or of the owner, would not give right to the defendants to resist the suit of Brazelton: for if he were a finder of the wreck, as such he

would be entitled to the property as owner, or to its possession as salvor, and would be protected from the interference of the defendants or other persons.   And for this reason decisions in admiralty upon the conflicting claims of salvors to the possession of deserted property are authorities to be considered in the settlement of the pending controversy.

Property is said to be abandoned when it is thrown away, or its possession is voluntarily forsaken by the owner, in which case it will become the property of the first occupant ; or when it is involuntarily lost or left without the hope and expectation of again acquiring it, and then it becomes the property of the finder, subject to the superior claim of the owner ; except that in salvage cases, by the admiralty law, the finder may hold possession until he is paid his compensation, or till the property is submitted to legal jurisdiction for the ascertainment of the compensation.   2 *Blk. Com.* 9; 1 *Bouv. Am. L.* 195, *No.* 494; *Coop. Just. Lib. II, Tit. I. S.* 46; *Abbott on Shipping* 555, *Am. note*; *Woolrych on Waters* 15; *Rowe vs. Berg*, 1 *Mas.* 373; *Lewis vs. The Elizabeth & Jane, Ware's Rep.* 43; *The Bee, ib.* 344, 345; *The St. Petre, Bee's adm.* 82; *The Mary*, 2 *Whea.* 126 *and note* (A.); *Steamboat J. P. Leathers and cargo, Newb. A. D.* 325; *Marvin on Wreck and Salvage, s.* 124, 125.

Some authorities refer to things found at sea as belonging to the finder, in distinction from wreck, that is, goods lost at sea and floated to land, or in general terms excluding the sense of derelict as used in Maritime cases, or as distinguished from custom and statutory law, and  in  extreme cases property wholly derelict and abandoned has been held to  belong to the finder against  the former owner.   *Woolrych on Waters* 14; *Constable's Case*, 5 *Coke* 108, *b*; *Marvin on Wreck & Salvage, sec.* 131, *note;* 1 *Bouv. Am. L.* 196, *No.* 496; *Wyman vs. Hurlburt*, 12 *Ohio* 87.

The occupation or possession of property lost, abandoned or without an owner, must depend upon an  actual taking of the property and with the intent to reduce it to possession.   The intent may not be that this possession shall be an absolute or perpetual appropriation of the property to the use of the finder,

it may be subject to the claim of the real owner, the possession may be taken for his exclusive good, or it may be taken as a means of subsistence or accumulation, according to the course of business of the parties to this suit. But in any case, title by occupancy must rest upon intentional actual possession of the thing occupied.

Such is the meaning of the Commentaries, from which are the following extracts.

" The acquisition of things tangible by occupancy, must be made *corpore et animo*, that is, by an outward act signifying an intention to possess. The necessity of an outward act to commence holding a thing in dominion, is founded on the principle that a will or intention cannot have legal effect, without an outward act declaring that intention; and, on the other hand, no man can be said to have the dominion over a thing which he has no intention of possessing as his. Therefore a man cannot deprive others of their right to take possession of vacant property by merely considering it as his, without actually appropriating it to himself; and if he possesses it without any will of appropriating it to himself, as in the case of an idiot, it cannot be considered as having ceased to be *res nullius*. The outward act or possession need not, however, be manual ; for any species of possession, or as the ancients expressed it, *custodia*, is in general a sufficient appropriation." 1 *Bouv. Am. L. No.* 495. Possession in the civil law " implies three things ; a just cause of possessing as master, the intention to possess in this quality, and detention * * without the intention there is no possession * * * *. Without the detention the intention is useless, and does not make the possession." 1 *Domat's civil Law, by Cushing* 859, No. 2161. " The possession of the things which we acquire by their falling into our hands, such as that which we find * * * * is acquired by the bare fact of our laying our hands upon them"—*Ib. No.* 2162. " Found—means, not merely discovered, but taken up." *Notes to Coop. Just.* 458. " Treasures naturally belong to the finder ; that is, to him who moves

them from the place where they are, and secures them;" *Ib.* 461.

The law is happily stated in the code of Louisiana thus : "To be able to acquire possession of a property, two distinct things are requisite : 1. The intention of possessing as owner ; 2. The corporeal possession of the thing." *La. Civil Code Art.* 3399.

Pothier, with his characteristic accuracy and perspicuity, has fully stated the law upon this subject, and the rule as stated by him is to this effect ; that to acquire possession of a thing there must be a desire to possess it, joined to a prehension of the thing. *See in full Nos.* 39 *to* 42 & *No* 55 *of his Traite De La. Possession,* & *Nos.* 63 & 64 *of his Traite Du Droit De Propriete*; Marvin on Wreck & Salvage *s.* 127.

Such are the doctrines of the Louisiana code, of the Commentators upon the Common, Roman, French and Admiralty law, and applying them to the facts of this case, we hold that Brazelton never attained to the possession of the wreck of the America, that he therefore had no title to it by occupancy, had no right upon which judicial protection could operate, none which the court below should have recognized. He had considered the wreck as his as its finder, but had not actually appropriated it to himself; his intention to possess was useless without detention of the property ; he had not found the lead in the required sense of discovering it, and taking it up ; he was not a finder, in that he had not moved the wrecked property, or secured it; he had the intention of possessing it as owner, but did not acquire its corporeal possession; to his desire to possess there was not joined a prehension of the thing.

Brazelton's act of possession need not have been manual, he was not obliged to take the wreck or the lead between his hands, he might take such possession of them as their nature and situation permitted ; but that his circumstances should give a legal character to his acts, making that to be possession which the law declares not to be possession, assumes more than a court can sanction. Marking trees that extended across the wreck,

affixing temporary buoys to it were not acts of possession; they only indicated Brazelton's desire or intention to appropriate the property. Placing his boat over the wreck, with the means to raise its valuables, and with persistent efforts directed to raising the lead, would have been keeping the only effectual guard over it, would have been the only warning that intruders, that is, other longing occupants would be obliged to regard, would have been such acts of possession as the law would notice and protect. If Brazelton in the winter of 1855, deferred raising the lead to wreck the steamboat Eliza, he was free to do so, but must abide the legal consequences of his choice. If afterwards he could not work in the main channel of the river, owing to high water, strong wind, or to damaged boats and rigging, his ill fortune could not bend the law to his circumstances, nor could he with right warn off the defendants from the occupancy of the America, when they were as willing and more able than himself to raise the lead in her hold.

The following adjudged cases may have a bearing upon this case, and illustrate the general principles of the last cited authorities:

In *Pierson vs. Post*, 3 *Caines Rep.* the plaintiff was pursuing a fox and had not got it within his control; and the defendant was held not to be liable for killing it. The plaintiff had established no claim by occupancy. His intention against the fox was unmistakable, but his act of possession was incomplete.

Marking a bee-tree was a more emphatic claim against the bees than Brazelton's marks were upon the wreck, but was not sufficient to vest a right in the finder. *Gillet vs. Mason*, 7 *Jhs.* 17.

And when one had found bees and had got leave of the owner of the tree in which they were to cut it, and take the bees, he acquired no property in the bees, he had not taken possession of them. *Ferguson vs. Miller* 1 *Cow.* 244.

It is not trespass to take wild bees or honey. *Wallace vs. Mease*, 3 *Binn.* 553.

A deer had been wounded and followed with dogs for six

miles, and the pursuit was given over for the night by the plaintiff, though his dogs continued the chase ; the defendant and the plaintiff seized the deer together, but, because this did not show an occupancy of the deer by the plaintiff, he could not recover the skin and venison of the defendant, who killed the deer. *Buster vs. Newkirk* 20 *Jhs*. 75.

The next authority is from an accomplished admiralty Judge, several of whose decisions are cited in this opinion:

" The title which is acquired to property by finding, is a species of occupation ; and it is laid down as a rule of law, by the civilians, that the mere discovery and sight of the thing, is not sufficient to vest in the finder a right of property in the thing found. *Pothier, Traite de la Propriete No.* 63. His title is acquired by possession, and this must be an actual possession. He cannot take and keep possession by an act of the will, *oculis et affectu*, as he may when property is transferred by consent and the possession given by a symbolical delivery. To consummate his title there must be a corporeal prehension of the thing." *The Amethyst, Davies Rep.* 23.

From the foregoing quotation may be seen the inapplicability of the citation from *Parson's Merc. Laws*, in the argument for Brazelton, as it relates to the delivery of bulky articles, the right of which is passed by sale.

The reference to the next case, except the extract from the opinion of the chanceller, is taken from the printed brief furnished for the defendant.

The case of *Deklyn vs. Davis* is like the present case. About the year 1781, the British frigate " The Hussar" sank in the East river in sixty or seventy feet of water.

The bill averred that she " was abandoned and derelict," and that " with much labor and expense" the complainants, in the summer of 1823, had discovered the " precise situation of the ship—had fastened chains around her, which they secured to floating timbers, and raised her about ten feet from her bed, and perfectly occupied the vessel, and continued their occupancy, by which she became their property. That at the approach of

33

winter they desisted from their labors, by reason of the weather, designing to resume the work in the following season. That the occupancy of the complainants continued until the defendants, with knowledge of complainant's rights, on the twenty-second of March, with vessel, etc., moored and anchored over and around the sunken ship." An injunction was granted, restraining the defendants "from the further interruption of the complainants" and also enjoining them "forthwith to remove the sloops."

" The defendants set up that the property was not abandoned or derelict when complainants took possession in 1823; that defendants, at great cost, had made preparation to raise the vessel; that they had " ascertained the precise situation and position of said frigate, took possession thereof, and to occupy the same, made their marks and ranges on the adjoining shore so as to identify the spot and enable them to commence their operations thereupon at the opening of the following season." That the complainants, " in the absence of the defendants and their men, fraudulently and forcibly took possession of the frigate ; " and afterwards Davis, in the absence of Deklyn and his men, took possession of the frigate by anchoring sloops over her and surrounding her with machinery· " The right claimed by each of the contending parties is the right of occupancy. Both parties have prepared means and have taken measures to raise the sunken frigate ; neither party has yet effected that object; and such being the state of the facts, the court says : " *Neither party has yet obtained an actual or exclusive possession of the derelict subject.* * * * The complainants allege in their bill that their acts of occupancy have obtained for them a title ; and the defendants, by their answer, insist that their acts preparatory to an actual possession, have been such as to give them a prior and superior right."

But if the acts of the complainant Deklyn did not constitute any " actual or exclusive occupancy," and if the acts of the defendant Davis were merely 'preparatory to an actual posses-

sion,' much less did the acts of Brazelton constitute such occupancy. *Hopkins, Ch. Rep.* 135.

The next two cases referred to, and from one of which a lengthy extract is given, were decided by JUDGE BETTS of New York, a very high authority in the matters treated upon : " * * * " but it is in consonance with the established principles of mar- " ritime law to hold those beginning a salvage service, and who " are in the successful prosecution of it entitled to be regarded " as the meritorious salvors of whatever is preserved, and enti- " tled to the sole possession of the property." *The Brig John* " *Gilpin, Olcott's Rep. Adm.* 86.

" An impression seems to have obtained, that one who finds derelict property under water or afloat, acquires a right to it by discovery, which can be maintained by a kind of continued claim, without keeping it in possession or applying constant exertions for its preservation and rescue. There is no foundation for such notion. The right of a salvor results from the fact that he has held in actual possession, or has kept near what was lost or abandoned by the owner, or placed in a dangerous exposure to destruction, with the means at command to preserve and save it, and that he is actually employing those means to that end.

' The finder thus becomes the legal possessor, and acquires a privilege against the property for his salvage services which takes precedence of all other title." *Lewis vs. The Elizabeth &* *Jane, Ware,* 41 ; *The Bee, Ware,* 332 ; *The St. Peter, Bee,* 82. " * * * The fact that property is found at sea or on the coast in peril, without the presence of any one to protect it, gives the finder a right to take it in his possession; and the law connects with such right the obligation to use the means he has at control, and with all reasonable promptitude, to save it for the owner. He can therefore be no otherwise clothed with the character of salvor than whilst he is in the occupancy of the property, and employing the necessary means for saving it.

" Notorious possession, with the avowal of the object of such possession, are cardinal requisites to the creation or mainten-

ance of the privileges of a salvor.; where they do not exist, any other person may take the property with all the advantages of the first finder." *The Schooner John Wurtz, Olcott Rep. Adm.* 469—471. *Marvin on Wreck and Salvage, s.* 128.

No reasoning, no comment can make more imperative the action of this court than it is made by the foregoing cases and authorities, taken in connection with the facts of the case, or with the allegations of the bill alone.

The decree of the Circuit Court of Mississippi county sitting in chancery is reversed ; and the case must be sent down with instructions for the dissolution of the injunction, and that a decree be entered for the recovery of the thousand dollars, with interest, that were assigned to Brazelton as his damages for being obstructed by the defendants in his work upon the wreck after the service of the injunction upon the defendants Patrick & Neaves.

If the fine inflicted had been considered in the court below, and had been a punishment for the contempt of the two defendants' disobedience to the process of the court, a different decree would have been called for upon this branch of the case

The defendants below, the appellants here, must recover their costs in this court, but to show our disapprobation of the conduct of defendants Patrick & Neaves in disregarding the process of the court, we direct that the costs in the court below be paid by them.