F. Gregg BEMIS, Jr., Plaintiff,

v.

The RMS LUSITANIA, her engines, tackle, apparel, appurtenances, cargo, etc., in rem, Defendant.

Civ. A. No. 2:94cv226.

United States District Court, E.D. Virginia, Norfolk Division.

April 18, 1995.

Glen A. Huff, Richard T. Robol, Huff, Poole & Mahoney, Virginia Beach, VA, for plaintiff.

## MEMORANDUM ORDER & OPINION

CLARKE, District Judge.

### I. RELEVANT FACTUAL AND PROCE-DURAL HISTORY

On May 7, 1915 the luxury liner RMS LUSITANIA ("Lusitania") was struck by a single torpedo fired by a U–Boat of the German Imperial Navy. She sank in less than 18 minutes, settling about 12 miles off the coast of Ireland.

The Plaintiff, F. Gregg Bemis, Jr. ("Bemis"), filed a Verified Complaint against the vessel on February 22, 1994. In an Order issued May 24, 1994 this Court concluded that it had jurisdiction to properly address Bemis' claims for title, salvage, and injunctive relief based on conditions set forth in that Order. Accordingly, the Court entered the Order for a Warrant of Arrest.[1]

On July 30, 1994, Ms. Muriel Light, the widow of John Light, wrote a letter to the Court. The contents of the letter disputed Bemis' Complaint and the Court construed

---

1. The Court also cautioned Bemis that he was to comply promptly and fully with all directions and conditions stated in the Order and that fail-

her letter as an Answer to the Complaint[2]. On September 7, 1994 Fifty Fathom Ventures, Inc. ("FFV") lodged a Claim and Answer. FFV sought a declaration of title and rights to the LUSITANIA. FFV based its claim on a recreational diving expedition undertaken to the shipwreck in June 1994. Argument with respect to FFV's claim was heard on November 9, 1994. In an Order dated November 10, 1994 the Court found that several factual underpinnings remained unresolved and therefore, the Court decided to re-examine the issue after a further hearing set for November 22, 1994. However, in a conference call on November 21, 1994, both parties asked the Court to continue the hearing for ten (10) days. In an Order dated November 22, 1994 the Court granted the combined motion and reset the case for evidentiary hearing and argument on FFV's claim on all issues including the issue of whether this Court has proper jurisdiction over the Lusitania.

On December 7, 1994 the Court heard live testimony and arguments on the timeliness of FFV's claim and ruling from the bench it denied FFV's Motion to File a Late Claim. Further, on December 8, 1994 the Court, with FFV's participation, heard evidence with respect to the Court's subject matter jurisdiction. In an Order dated January 6, 1995 this Court concluded that it was proper for the Court to retain jurisdiction, consistent with the Court's earlier Order dated May 24, 1994.

In addition, on February 22, 1995, the Court entered an Order dismissing with prejudice the claim of Mrs. Muriel Light, after Mrs. Light and Bemis represented to the Court that all matters in controversy between the two parties had been compromised and settled.

The Court held a hearing regarding Bemis' claim to title by both conveyance and salvage on March 17, 1995. The Court heard live testimony from Bemis and Mr. George Macomber ("Macomber"), Bemis' former business partner in the Lusitania venture. Addi-tionally, the Court received exhibits and four *de bene esse* depositions.

## II. *TITLE BY CONVEYANCE*

The Lusitania was sunk on May 7, 1915 off the southern coast of Ireland. In May 1915 Cunard Steamship Co. ("Cunard") owned the Lusitania. The Liverpool and London War Risks Insurance Association Limited ("Liverpool and London") paid a total loss claim to Cunard and the rights and interest in the vessel passed to Liverpool and London. By a letter dated March 2, 1967, Liverpool and London sold to John F. Light ("Light") "the rights and interest in the wreck of the LUSITANIA on the understanding that it would not be salved as a whole, repaired and put into commission again, and also that the purchaser takes over all liabilities and expenses which might attach to the wreck." Ex. 1.[3]

On April 16, 1967 Light entered into an agreement with Holt, Rinehart and Winston, Inc. ("HRW"), known as the "Photographic Agreement". Ex. 6. HRW advanced $136,-785.47 to Light under the Photographic Agreement. *Id.* The Photographic Agreement provides:

> the repayment of all moneys advanced to Light or for his account shall be secured by a first lien and security interest on, among other things, all his salvage and other proprietary rights in and to the wreck of the Lusitania and all photographic, television, diving and marine equipment and other tangible property acquired or used by him to conduct the photographic operations and salvage operations.

*Id.*

The Photographic Agreement further requires Light at HRW's request to execute, acknowledge and deliver any assignment, mortgage, financing statement or other instrument or conveyance that HRW may request to secure and perfect HRW's rights under or otherwise implement the provisions of the Photographic Agreement. Further, it

---

ure to do so would cause the Court to re-evaluate its exercise of jurisdiction in this matter.

2. The Court found that Ms. Light filed the Answer both in her individual capacity and in her capacity as the Administratrix of her husband's estate.

3. The Exhibit numbers refer to the hearing on March 17, 1995 unless otherwise specified.

provides that in the event of Light's refusal or failure to do so, HRW shall have full power and authority as attorney-in-fact for Light to execute, acknowledge and deliver any such instrument or conveyance. Ex. 6 at 15, ¶ 9.

By Bill of Sale dated January 10, 1968 Light transferred sixty (60) percent of his interest in the Lusitania to Macomber. Ex. 5. Shortly thereafter, by Bill of Sale dated July 29, 1968, Light transferred to Macomber an additional six and two-thirds percent interest in the vessel. Ex. 8. The Bills of Sale were signed for Light by attorney F. William Andres under a Power of Attorney. The Power of Attorney was executed on April 24, 1967 or 1968. Ex. 7.[4] When looking at the document the year is unclear: 1967 is typed in, however, an eight is written in just above the typed year. None of the witnesses' addressed this issue; however, the Court finds it ultimately immaterial. Macomber testified that these transfers were in consideration of Macomber's refraining from discontinuing to finance the project. The Sales were subject to the lien secured by HRW.

Testimony of both Bemis and Macomber indicate that in late 1968, Macomber sold fifty (50) percent of his interest to Bemis. On April 12, 1968 Light agreed to give Macomber and Bemis each the right to a one-third share of the proceeds and benefits of the Photographic Agreement. Ex. 9.

By an agreement made July 12, 1969 between HRW and Macomber, HRW with Light's consent, assigned to Macomber, acting for himself and Bemis, HRW's entire right to and interest in the Photographic Agreement. Therefore, Macomber and Bemis acquired HRW's rights and interests in the Photographic Agreement. In consideration for said assignment Macomber paid HRW $136,785.47. Ex. 11.

On June 4, 1971 Macomber wrote a letter to Light requesting Light to execute and deliver to attorney D.F. Williams of Cork, Ireland several mortgage documents, including the document for the Lusitania. Exs. 12 & 13. Macomber had the authority to demand this from Light pursuant to the Photographic Agreement that Light entered into with HRW and which rights in the Photographic Agreement HRW subsequently sold to Macomber. Ex. 6.

On June 7, 1971 Bemis wrote a similar letter demanding payment of notes due. Ex. 14. Bemis had the same authority as Macomber to make such a demand as outlined above.

Bemis and Macomber testified that the letters were hand delivered to Light at his residence in Kinsale, Ireland in June 1971. Further, they both testified that Light never executed the mortgage documents nor responded to Macomber's letter. Light defaulted under the terms of the Photographic Agreement. Upon default, Macomber, as HRW's assignee, became entitled to take possession of, and retain, the Lusitania in satisfaction of the debt.

At the March 17, 1995 hearing Macomber testified that in the mid–1980s he withdrew from the operation and assigned his entire right, title and interest in the Lusitania to Bemis. The conveyance was formalized in a letter dated October 20, 1986, a letter dated September 24, 1990 and an instrument dated July 21, 1993. Exs. 17–19.

Additionally and significantly, on February 22, 1995, Mrs. Light and Bemis reached a settlement agreement wherein Mrs. Light assigned all of her rights, title and interest in the Lusitania, both individually and as Administratrix of the Estate of John Light, to Bemis. Ex. 15. Thus, even if Light had retained some interest in the Lusitania, Bemis is now owns such interest.

The Court finds that Bemis has established an accurate and complete chain of title. However, what remains unclear is exactly what was conveyed. The Court finds that the title indeed covers Lusitania's hull, engines, tackle, apparel and appurtenances. The inquiry is whether the cargo and personal effects of passengers and crew are includ-

---

**4.** The document was identified and authenticated by the *de bene esse* deposition of attorney C. Thomas Swaim. Mr. Swaim was an associate working directly under Mr. Andres and he was a witness to the execution of this document.

ed in this claim. Bemis claims that, in addition to the hull, engines, tackle, apparel and appurtenances, the chain of title also covers the cargo and personal effects of everyone on board. Bemis testified that it was his understanding that his former attorney, Mr. F. William Andres, believed cargo and personal effects of those on board were included. Furthermore, many of the above described documents include cargo in the description of what was to be conveyed. In addition to his argument that the cargo and personal effects of passengers and crew were directly conveyed in the chain of title, Bemis argues that he has title to these items (in addition to items directly owned by Cunard Lines) based on either recognition and enforcement of a decision by the Queen's Bench Divisional Court in England or abandonment. The Court will first address his direct conveyance argument.

■ To determine if the chain of title includes the cargo and personal effects of passengers and crew, the Court must look to the beginning of the chain. In May 1915 the Lusitania was owned by Cunard, which had the vessel insured with Liverpool and London. After the vessel was sunk, Liverpool and London paid a total loss claim to Cunard and all rights and interests in the vessel passed to Liverpool and London. So the question that must be addressed is whether Liverpool and London acquired any interest in the cargo and personal effects when it paid a total loss claim to Cunard.[5]

The Court finds that Cunard did not and could not transfer rights in the cargo or personal effects. The first piece of evidence regarding the title is the letter Liverpool and London sent to Light on March 2, 1967. *See* Ex. 1. The letter states in pertinent part:

"*LUSITANIA*"—*SUNK 1915* This vessel was entered in the Association in 1915 and was sunk on the 7th May, 1915, off the Southern Coast of Ireland. Subsequently, the Association paid a total loss claim to the Owners and the rights and interests in the vessel passed to the Association. . . .

the Association has sold to you the rights and interests in the wreck of the "Lusitania" on the understanding that it will not be salved as a whole, repaired and put into commission again, and also that the purchaser takes over all liabilities and expenses which might attach to the wreck.

*Id.* This does not establish that the interest in the cargo and personal effects of passengers and crew were included in this assignment. In fact, literal reading of the letter of conveyance dictates just the opposite. The Owner, Cunard, did not have any interest in the cargo or the personal effects of passengers and crew and as such could not pass those rights to Liverpool and London. Furthermore, the plain language of the letter indicates that the rights and interests in the vessel passed to the Liverpool and London Association, and cargo and personal effects were not included.

Bemis argues that on the face of its conveyance on March 2, 1967, it is clear that Liverpool & London sold the rights to the "wreck" to Light and that under established English law, the "wreck" includes all items on the shipwreck, of whatever origin. *See* Kennedy, *The Law of Salvage* § 188 (5th ed. 1985). However, the Court is not persuaded by this argument as it is clear from the letter of conveyance that Liverpool & London sold the rights to the vessel and not to the cargo and personal effects. Furthermore, there is no evidence that Liverpool and London paid a loss for the cargo or personal effects of everyone on board from which to become subrogated to or from which to claim a transfer of ownership from cargo owners or passengers. While it is true that at one point in the letter the term "wreck" was included, it is equally true that the letter also said, "the rights and interests in the *vessel* passed to the Association." This would not pass title to the cargo or personal effects. The Court is not persuaded that the original contract between Cunard and Liverpool and London included the cargo or the personal effects of passengers and crew. Therefore, Liverpool

---

5. The Court notes that Bemis did not present any evidence covering the insurance contract between Cunard and Liverpool and London. Therefore, the Court looks to the letter sent by Liverpool and London to Light on March 2, 1967 in an effort to determine the scope of insurance coverage.

and London never had title to such to convey to Light.

Bemis also argues that the conveyance from Cunard to Liverpool and London included the cargo and passenger items as it is confirmed by later conveyances that expressly include the term "cargo" in the contract. Yet this argument is not sound because if Cunard did not have any interest in the cargo or personal effects then it is irrelevant what the others thought they were conveying.

Therefore, the Court finds that while the vessel, her hull, engine, tackle and appurtenances pass to Bemis through a clear chain of title, the cargo and personal effects of passengers and crew have not been conveyed by title.

## III. ENTITLEMENT TO CARGO AND PERSONAL EFFECTS BASED ON THE ENGLISH COURT'S DECISION

■ Bemis argues that independently, *Pierce and Another v. Bemis and Others: The Lusitania*, 1 Q.B. 401 (1986) [hereinafter *Queen's Bench*], confirms Bemis' and Macomber's title to cargo and passenger's personal effects. The Court does not agree with this interpretation of the opinion. The English Court opinion makes clear that it was stipulated among the parties that Bemis and Macomber had legal title to the vessel, therefore, that was not an issue before the English Court. What was at issue was whether the British Crown was entitled to the artifacts that the claimants, including Bemis, brought up from a 1982 diving expedition. The artifacts were items that came from the cargo and the personal effects. The Court held that the Crown did not have a valid claim to the title of the artifacts and therefore, the claimants had better title than anyone else. It was on the basis of possessory title, not title by conveyance, that the Queen's Bench Divisional Court declared Bemis and the other claimants to be the owners of the artifacts. As it turned out, the claimants, participants in the 1982 expedition, divided the artifacts amongst themselves.

This Court does not contest or find anything in the present case inapposite from the ruling by the Queen's Bench; in fact, the Court's ruling today is entirely consistent with that from the Queen's Bench. First, the Court notes that the parties involved in the English litigation did not agree that Bemis had title by conveyance as to the cargo and personal effects. Furthermore, the Queen's Bench found only that the Crown had no right to the property as a droit of Admiralty and that as such no one else had better right to the contents that Bemis and Macomber, as divers, recovered from the wreck. Essentially, it awarded them possessory title. There was no adjudication as to rights in future artifacts.[6] While keeping in perfect harmony with the English Court, this Court agrees that all of the contents awarded to him during the English litigation are his. Furthermore, the Court finds that based on the law of finds, as set forth below, he has acquired title to the contents he brought up on the 1993 and 1994 expeditions.

In order to acquire title to cargo and personal effects salvaged, aside from those covered by the English Court's decision, he now must establish rights either through the law of salvage or the law of finds.

## IV. ENTITLEMENT TO CARGO AND PERSONAL EFFECTS BASED ON ABANDONMENT

Finally, Bemis argues that based on abandonment, he is entitled the remaining cargo and personal effects. Before the Court determines whether Bemis is entitled to these contents, it must first determine the applicable law. Two legal theories of law may be applied to shipwrecked vessels: the law of finds and the law of salvage. For the reasons set forth below, the Court finds that both doctrines are applicable to the instant case and discusses each in turn.

LAW OF FINDS

■ The common law of finds, expresses "the ancient and honorable principle of 'finders, keepers.'" *Martha's Vineyard Scuba HQ v. Unidentified Vessel*, 833 F.2d 1059, 1065 (1st Cir.1987). Traditionally, the law of

6. If there had been, Bemis would not need to be in this Court.

finds was applied only to maritime property which had never been owned by anybody. Yet recent trends suggest applying the law of finds when there has been a finding that the sunken property has been abandoned by its previous owners. *E.g., Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.,* 974 F.2d 450, 464 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993); *Moyer v. Wrecked and Abandoned Vessel known as the Andrea Doria,* 836 F.Supp. 1099, 1104–05 [hereinafter *Andrea Doria* ]. The key to ownership is whether the owner has abandoned the property. Abandonment by the owner can be express or implied. Lapse of time and non-use by the owner may give rise to an inference of an intent to abandon. *Andrea Doria,* 836 F.Supp. at 1105 (citing *Wiggins v. 1100 Tons, More or Less, of Italian Marble,* 186 F.Supp. 452, 456 (E.D.Va.1960)). Additionally, the Fourth Circuit has stated that abandonment can be inferred in the case of a historic shipwreck when no owners come forward during the action to claim ownership rights. *Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.,* 974 F.2d at 461. In this case, no owners have come forward and the Verified Complaint was filed in February 1994. In addition, it has been almost eighty years since the sinking of the vessel. The Court finds that the cargo and the personal effects have been abandoned.[7] Finding that the contents have been abandoned, the Court deems it appropriate to

apply the law of finds to determine if title to the contents vests in Bemis. Pursuant the common law of finds, the ownership of abandoned property depends on the finder taking possession. "Title to abandoned property is acquired by the finder who demonstrates 'occupancy', which is defined as 'taking possession of the property and exercising dominion or control over it.'" *Andrea Doria,* 836 F.Supp. at 1106 (citing *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560, 572 (5th Cir.1981) [hereinafter *Treasure Salvors III* ]). Once the finder establishes possession, he holds title to the property which is good against all, including the original owner since abandonment forfeits all the owner's rights.[8]

## 1. CARGO AND PERSONAL EFFECTS ALREADY SALVAGED

Aside from the 1982 expedition, Bemis has only recovered one artifact from his expeditions: one spoon from the cargo. The Court finds that the title to the one spoon from the cargo that Bemis brought into this district from his 1993 expedition belongs to Bemis pursuant to the law of finds. Bemis testified on April 26, 1994 that they gathered that one artifact from the 1993 expedition. He was in a submarine down on the bottom of the ocean floor, he spotted a spoon amongst the wreckage and used the submarine's grasping mechanism to secure it.[9] On March 17, 1995

---

**7.** The Court notes that this finding is in complete harmony with the Queen's Bench decision. "So far as the owners of the contents are concerned, it is a necessary inference from the agreed facts and from the lapse of 67 years before any attempt was made to salve the contents that the owners of the contents abandoned their property." *Queen's Bench* at 6.

**8.** Two exceptions to the rule are recognized: First, when the abandoned property is embedded in the soil, it belongs to the owner of the soil; Second, when the owner of the land where the property is found (whether on or embedded in the soil) has constructive possession of the property such that the property is not "lost," it belongs to the owner of the land. *Klein v. Wrecked and Abandoned Sailing Vessel,* 758 F.2d 1511, 1514 (11th Cir.1985) (citations omitted). The Court finds neither exception applicable to the instant case. There has been no evidence that any of the cargo or the personal effects are

embedded in the soil. Further, there is nothing in the record to indicate that the Republic of Ireland has exercised constructive possession of the property such that the property is not "lost". While there is evidence in the record that the Office of Public Works for the Republic of Ireland has recently issued an Underwater Heritage Order, there was no such order at the time Bemis made his expeditions or asserted his claim. The order would prevent any further diving on the wreck without prior authority from the Irish government.

Furthermore, the Court notes that the contents that were the subject of the English Court decision are not in issue in this case and that title in those objects indisputably rests with Bemis and the other claimants in accordance with their informal agreement.

**9.** In later hearings, Bemis testified that no artifacts were recovered during the 1994 expedition.

Bemis testified that he recently learned that the spoon recovered from the 1993 expedition originated from the cargo. After making the determination that the cargo has been abandoned by the previous owners, the Court finds that title in the spoon vests in Bemis.

## 2. CARGO AND PERSONAL EFFECTS STILL SUBMERGED

■■■ The question that remains is whether Bemis can be awarded title, under the law of finds, to all the cargo and personal effects still on the ocean floor and within the hull. The Court, as stated above, finds that the contents have indeed been abandoned. And as stated by Judge Walter E. Hoffman:

> Holding that the vessel and its cargo have long since been voluntarily abandoned, the following rule applies: "Personalty, on being abandoned, ceases to be the property of any person, and thenceforth is no man's property, unless and until it is reduced to possession with intent to acquire title to, or ownership of, it. It may, accordingly, be appropriated by anyone, if it has not been reclaimed by the former owner, and appropriating it and reducing it to possession with intention to become its owner, provided, it has been said, the taking is fair.

*Wiggins v. 1100 Tons, More or Less, of Italian Marble,* 186 F.Supp. at 456. The first person to reduce such property to possession, either actual or constructive, becomes its owner. R. Brown, *The Law of Personal Property* 15 (2d ed. 1955). The early American case of *Eads v. Brazelton* suggests that if a salvor keeps a ship over the wreck and carries on a continual salvage operation, the salvor establishes possession of all the contents. *Eads v. Brazelton,* 22 Ark. 499, 511 (1861).

In a more recent case, the Southern District of New York found that the law of finds precluded an award of property when the parties have not located the contents, let alone possessed or controlled them. *Hener v. United States,* 525 F.Supp. 350, 355 (S.D.N.Y.1981). In reaching this conclusion the *Hener* Court noted that in cases where courts awarded title to and an exclusive right to recover the entire cargo, the parties had recovered a large part of the cargo. *See id.*

(citing *Treasure Salvors Inc. v. Unidentified Wrecked and Abandoned Vessel,* 546 F.Supp. 919 (S.D.Fla.1981)). In precluding the award of property, the *Hener* Court noted that in the *Treasure Salvors* case the party involved had recovered much of the cargo and had placed the rest within its possession to the extent consistent with the nature of the cargo, and that the party was "engaged in systematic, unrelenting work to recover all the remaining cargo from the entire area over which it was scattered". *Hener,* 525 F.Supp. at 355.

"To justify an award of title (albeit of one that is defeasible), the law of finds requires a finder to demonstrate not only the intent to acquire the property involved, but also possession of that property, that is, a high degree of control over it." *Id.* at 356.

In Paragraph 11 of his Verified Complaint, Bemis contends that he "has located the shipwreck and has and is actively and successfully engaged in possession and dominion, as well as conditions and circumstances permit, and has the current ability to continue such." However, this Court is not persuaded that with regards to the submerged cargo and personal effects Bemis has demonstrated possession or the degree of control necessary to vest title under the law of finds. While there is nothing in the record to clearly indicate exactly what artifacts from the 1982 expedition are part of the cargo, Bemis did testify on March 17, 1995 that he recently learned that the one spoon recovered during the 1993 expedition actually came from the cargo.

The Court does not find this as evidence of enough control to demonstrate possession over all of the cargo and personal effects. "Success of a finder is measured solely in terms of obtaining possession of specific property." *Hener,* 525 F.Supp. at 356. Here, there is nothing to indicate that Bemis has possessed or is in control over any of the contents remaining submerged. At best Bemis has established one successful expedition in 1982, a photo expedition with the National Geographic Society in 1993 and a failed expedition in 1994. This does not demonstrate the possession, dominion or control sufficient to vest title to all the cargo and

personal effects remaining in the hull or on the ocean floor. The law of finds precludes the Court from awarding Bemis title to the cargo and personal effects of the passengers and crew that remain submerged.

## V. *LAW OF SALVAGE*

■■■ In the alternative, Bemis argues that he is entitled to a liberal salvage award and injunctive relief so that he may have the sole right to continue salvage operations. Three elements must be established in order to assert a salvage claim. First, the property rescued must be in marine peril. Courts will usually find that underwater shipwrecks are in marine peril, because sunken vessels and their cargoes are in danger of being lost forever. *See, e.g., Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330, 336–37 (5th Cir. 1978). Next, the salvage service must be voluntary. Finally, the salvage must be successful, in whole or in part. The salvor can receive a salvage award only through actual recovery of the property. Although the law of salvage, like the law of finds, requires a salvor to establish possession over property before obtaining the right to exclude others, "possession" means something less in salvage law than in finds law. *Hener,* 525 F.Supp. at 357. In the salvage context, only the right to compensation for service, not the right to title, usually results; "possession" is therefore more readily found than under the law of finds. *Id.* Furthermore, the possession need not be continuous, but only as such the "nature and situation" of the salvage operations permit. *Id.* at 354 (quoting *Eads v. Brazelton,* 22 Ark. at 511). Generally, the Court will grant an exclusive right to salvage if the salvor's effort is ongoing and there is likelihood of success.

As a substitute for possession, one Court has focused on whether the salvor's efforts were taken with due diligence. *See, Andrea Doria,* 836 F.Supp. at 1107. If due diligence is demonstrated, then the Court next determines whether the operations are ongoing. "This inquiry has a slightly different focus than the due diligence inquiry: the evaluation looks not only to the salvor's past efforts, but also his present intentions." *Id.; see Treasure Salvors III,* 640 F.2d at 567. ("so long as the original salvors appear ready, willing and able to complete the salvage project.") The *Andrea Doria* Court found that the salvor's efforts were on-going when adverse sea and weather conditions prevented him from continuing salvage operations during the summer in question. The Court looked to his future plans and found that based on the salvor's intention to continue his search the following summer he had demonstrated that his efforts were sufficiently "ongoing" to support the issuance of an injunction to secure those efforts.

■■■ However, even following the most relaxed standard for establishing possession, due diligence or continuing salvaging operations, the Court is still not persuaded that Bemis has demonstrated the requisite amount of possession over the contents to qualify for the exclusive right to salvage in the future. In the present case, the Court is not convinced that Bemis has met any of these standards. Rather, the Court finds that Bemis does not meet the requisite "possession" requirements, has not conducted ongoing salvage operations and has not shown a fair chance at success in the future.

To support this finding, the Court notes that in the past 13 years Bemis has participated in only three expeditions to the shipwreck. The first expedition was in 1982 and a crew of divers, at Bemis' direction, recovered approximately 94 artifacts. The next expedition did not occur until 11 years later when in 1993 Bemis entered into a cooperative agreement with the National Geographic Society and Dr. Robert Ballard[10]. The trip also included historians, artists, ship engineers, photographers, and sonar imaging experts. As set forth more fully below, although Bemis was present for the expedition, he did not substantially contribute to the operation. In fact, the Court notes that he was paid for the effort. In the words of Dr. Ballard, when asked if Bemis played a coop-

---

10. Dr. Ballard is Senior Scientist and Director of the Center for marine Exploration at the Woods Hole Oceanographic Institute. Dr. Ballard's experience includes exploration of historic shipwrecks, such as the *Titanic, Bismark, Isis* and *Lusitania.*

erative role in the 1993 expedition, "Yes, in that he did not obstruct or in any way try to affect or alter our operational plan that we had submitted to him . . . ."

The most recent expedition, during the summer of 1994, fell far short of its expected success. Before the expedition, Bemis testified that it was to be a two week expedition to "accumulate additional scientific and historic data about the shipwreck," and selectively gather additional artifacts to include in a travelling Lusitania museum. Aff. of Bemis, at 2. However, as Bemis himself testified, the plans were truncated. A supplier of some necessary equipment pulled back, leaving Bemis with only enough equipment for four divers. The expedition only lasted two days after a diving accident severely injured one of the divers. No artifacts were recovered, although Bemis did place a commemorative placque on the side of the ship. Therefore, the Court concludes that Bemis is not in "possession" of the contents for purposes of pursuing exclusive salvage rights.

Furthermore, the Court finds that Bemis is not participating in ongoing salvage operations nor has he shown a fair chance of future successful salvage. Bemis has submitted *de bene esse* depositions to support his position that he is capable of performing successful salvage operations in the future and that future salvage expeditions would have a positive role in contributing to the historic and scientific understanding of the shipwreck. The Court does not find these persuasive in light of all events as they have unfolded.

First, Bemis introduced the deposition of Dr. Robert Ballard. As stated above, Dr. Ballard is the Director of the Center for

Marine Exploration at the Woods Hole Oceanographic Institute. Ballard states that he sought out Bemis in 1991 when the National Geographic Society was interested in an expedition to explore the Lusitania. Ballard and Bemis reached an agreement that resulted in the 1993 expedition. The expedition sought to explore the shipwreck, and the purpose as set forth in paragraph one of the agreement was clearly protecting the scientific, historical and educational values. Ballard stated that Bemis played a cooperative role and that he came out to the exploration site almost every day. However, as noted above, Ballard also testified that Bemis' contribution was that he did not change the plans and arrangements as proposed by Ballard. Nothing in the record indicates that Bemis did any independent research. As such, the Court finds that Bemis did not have a significant role in the 1993 expedition. Furthermore, only one spoon was salvaged throughout the entire expedition.[11] Ballard also testified that future expeditions would have a positive role in contributing to the historic and scientific understanding of the shipwreck and that Bemis' ownership has played a positive role in protecting the ship. This last statement of Ballard, that Bemis' ownership has played a positive role in protecting the ship, appears to the Court to be conclusory and without any factual support. The Court does not attach any significance to it when passing on the issue of whether Bemis has been conducting ongoing salvage operations.[12]

Bemis also presented the deposition of Louis L. Tapscott, the Senior Vice President of Sonsub, Inc. Mr. Tapscott has over thirty-five years of executive, management and operating experience in the subsea industry.

11. The Court does note that in addition to the spoon, the expedition also produced valuable information about the vessel. As Ballard testified, "this was the most thorough and scientific expedition ever carried out on the Lusitania. All previous expeditions were very cursory in nature, many of which were carried out for salvage purposes and not for scientific inquiry." Ballard Dep. at 18–19. While this testimony has value in assessing the dominion and control Bemis is attempting to exercise over the Lusitania such value is minimal considering Bemis' lack of actual planning and organization of the 1993 expedition.

12. The Court realizes that "ongoing operations" also includes plans for the future; however, the Court is not persuaded that Bemis has demonstrated the requisite amount of possession over the submerged cargo. Therefore, the Court evaluates the testimony concerning future operations in light of the past attempts in order to determine if the salvage operations can be deemed "ongoing". In the instant case, the Court finds that Bemis' efforts do not establish an "ongoing" salvage operation.

The essence of Tapscott's testimony was that based on his expertise and familiarity with Bemis, he feels Bemis understands the financing and legal sides of salvage projects as well as the diving area. Tapscott asserts that Bemis is very capable with respect to the management, financing, technology and operations as to the Lusitania shipwreck and is totally competent to conduct future salvage operations on the wreck.

The Court finds that Tapscott's statements are conclusory and furnish no factual background for the conclusions. Therefore, the Court gives little weight to Tapscott's deposition. Furthermore, even if the Court assumed Tapscott had the necessary factual background to make such an assessment, the Court is of the opinion that his testimony fails to show that Bemis has been conducting ongoing salvage operations or was otherwise exercising any control over the Lusitania.

Finally, Bemis submitted the deposition of Mr. Les Joiner, President of The Ocean Corporation. Mr. Joiner has been involved with Bemis and working on the logistics of trying to put together a future expedition on the Lusitania. Joiner states that Bemis is very capable of management, financing, technology and operation of projects to recover the Lusitania shipwreck. Furthermore, he believes that Bemis is capable of future recovery efforts with respect to the Lusitania at any time, provided the vessel, manpower and weather window are favorable. While Joiner expresses his opinion concerning Bemis' capabilities, he also fails to give a factual background for that opinion.

In conclusion, the Court finds that Bemis has not demonstrated possession of the cargo or personal effects nor has he engaged in the sustained salvage operations which would justify a grant of exclusive salvage rights. While he has submitted evidence that he may be in the position to conduct future operations, the Court is not persuaded that such a claim currently entitles him to exclusive salvage rights. Therefore, this Court denies his request for exclusive salvage rights to the cargo and personal effects.

 Furthermore, the Court denies his request for a salvage award. Pursuant to the law of finds, Bemis has been allowed to keep all of the contents that he has salvaged; therefore, an award is not appropriate.

In addition, on October 9, 1994, the Court ordered an immediate accounting of what was brought up from the Lusitania by the directors of FFV. FFV was to place all artifacts in the possession of the United States Marshal Service. The artifacts placed in the hands of the Marshal pursuant to the Order are one (1) brass porthole; two (2) octagonal terra cotta tiles; one (1) brass frame for deck prism diffuser, stamped "Hayward's Patent London Borough"; and two (2) glass prisms marked "Ward Brothers". The Court finds that all of these items came from the hull of the vessel and in accordance with this opinion are to be delivered to Mr. Glen Huff, Bemis' counsel of record, who in turn shall deliver said articles to Mr. Bemis.

## VI. CONCLUSION

The Court concludes that Bemis has established an accurate and complete chain of title to the vessel, her hull, tackle and appurtenances. However, the cargo and personal effects of passengers and crew have not been conveyed by title.

With respect to the cargo and personal effects of passengers and crew that have been salvaged from past expeditions, the Court concludes that those items had been abandoned and that pursuant to the law of finds lawful title to such contents now vests with those who salvaged them. The Court distinguishes the already salvaged cargo and personal effects from the cargo and personal effects still remaining submerged. The Court concludes that Bemis has not established any exclusive rights to the cargo and personal effects submerged pursuant to either the law of finds or salvage law. Therefore, the Court denies Bemis claim to title to the still submerged cargo and personal effects of the passengers and crew based on conveyance or the law of finds. Furthermore, it denies his request for either a salvage reward or injunctive relief.

Additionally, the artifacts having been a part of the vessel itself that were the basis of FFV's claim throughout the November and

December hearings also belong to Bemis based on the above demonstrated chain of title by conveyance. The United States Marshal Service is directed to deliver said artifacts to Bemis' counsel for delivery to Bemis.

IT IS SO ORDERED.